EDWARD P. FOSTER v. LUMBERMEN'S MINING COMPANY.

*Contract of sale—Passing of title—Price and terms of payment— Delivery—Trover and conversion—Conflict of laws— Statute of frauds.*

1. An agreement for the sale of a quantity of iron ore, for a *price* per ton dependent upon *that* received by the vendee on its sale, lacks an essential ingredient of a contract of sale, and cannot be enforced.

2. In order to pass the title to personal property under a contract of sale, the purchase price must be fixed, and, if credit is given, the time and terms of payment must be stated. *Cass v. Gunnison, ante,* 147 (head-note 1).

3. Under an agreement for the sale of a quantity of *lean* iron ore, to be delivered on the cars by the vendor after the worthless portion was removed, as sold by the vendee to third parties, the *title* will not pass until such delivery.

4. The owner of personal property who has contracted for its sale,

but has not parted with his title or right of possession, cannot be guilty of its *unlawful* conversion.

5. A contract between a corporation and citizen of Michigan for the sale of property in said State, to be there selected, weighed, and delivered, and the contract fully performed, is subject to the statute of frauds of that State, and, in its construction, it is of no consequence where the agents or servants of the corporation reside.

Error to Menominee. (Grant, J.)    Argued November 1, 1887.    Decided January 12, 1888.

Trover for the conversion of a quantity of *lean* iron ore. Defendant brings error.    Reversed.    The facts are stated in the opinion.

*Ball & Hanscom* (*B. J. Brown*, of counsel), for appellant.

*Kruse & Flannigan* (*W. P. Healy*, of counsel), for plaintiff.

SHERWOOD, C. J.    This is an action of trover to recover for the conversion of a quantity of lean ore, taken from the Ludington mine, and lying on the premises, and claimed by the plaintiff to be his property.    The pile was estimated to contain about 14,000 tons, and was not uncommonly called "refuse rock."    The record shows that ore yielding less than 50 per cent. of iron is usually regarded as unsalable.

The land upon which the mine was located belonged to the Lake Superior Ship-canal, Railway & Iron Company, and was operated by the defendant under a lease from that company, by which the defendant was authorized to mine and take away iron ore at a certain royalty, to be paid to the owner of the land.

In the spring of 1886, the plaintiff and John D. Jones were desirous of purchasing, or making an arrangement whereby they could sell, this rock pile, and receive a share of the proceeds, and for that purpose the plaintiff had a treaty with the managing officers of the defendant, whose attention

was first called to the subject in a brief conversation with G. E. Stockbridge, who was general manager of the company, and who informed the plaintiff that A. A. Carpenter, who was president of the company, was the man for him to treat with in the matter; that he was going to Chicago in a few days, and would then speak to him upon the subject. From this time on the arrangement seems to have been mostly made by letter. Mr. Stockbridge, from Kalamazoo, on the third day of March, 1886, wrote to the plaintiff as follows:

"*D;ar Sir:* After due consultation with Mr. Carpenter, I am obliged to say that we cannot make you any price on the refuse rock pile at our mine that would warrant you in undertaking to handle it. We should have to pay a small royalty on it, and, if we paid the royalty, the rock is worth more to us to turn back into the mine than it could possibly pay you to handle it."

Mr. Foster, on March 25, wrote from Iron Mountain to Mr. Carpenter as follows:

"*Dear Sir:* Not having heard from you, and not having met Mr. Stockbridge when here, thought best to ask you if anything had been heard in regard to royalty on refuse ore, which we are talking of."

To this Mr. Carpenter replied, on March 26, as follows:

"*Dear Sir:* Yours of yesterday is at hand. I have to-day written Mr. Stockbridge, and sent him copy of your letter, and as soon as I hear from him will let you know. When he was here I did not ask him about the rock pile."

And, on the twenty-ninth of March, Carpenter, after receiving a letter from Mr. Stockbridge, wrote the plaintiff:

"*Dear Sir:* I have a letter this morning from Mr. Stockbridge, in which he says that he is satisfied by his investigations at the mine that we cannot sell the pile of rock to you at any price that you can afford to pay for it; that it is worth more to us for filling than anything that we can get out of it by selling."

On the thirty-first of March, the plaintiff replied to this letter as follows:

" *Dear Sir:* Yours of the twenty-ninth received. There is evidently a misunderstanding between Mr. Stockbridge and yourself, or some price could be named that you would take for the rock pile. I take it that Mr. Stockbridge is not the one to say what I can afford to pay for it, but to name price I can have it for, and, if satisfactory, can then come to an understanding. From assurances given me by Mr. Stockbridge I have made partial arrangements for some of it, and would like to fulfill my agreement. Will you advise me soon what can be done in the matter?"

To this letter Mr. Carpenter made the following reply:

" CHICAGO, April 5, 1886.

" E. P. FOSTER, ESQ.,

"Iron Mountain, Mich.

" *Dear Sir:* Your favor of the thirty-first ult. is at hand. The pile of rock is worth to us as it lies 25 cents a ton for filling. If you can sell it so that you and we can make something over this sum, all right; but we must first know what royalty we have to pay, and when we know this we will add this amount to the 25 cents, and you can have one-half of the amount that can be obtained for it over this sum, provided there be enough gotten over the 25 cents per ton to make it an object for us to bother with it. So let us know what you can get for it, and, if it is enough so that it will pay us, we will find out what royalty we must pay, and can then determine; but you must not sell it until we have found out what the royalty will be, and have determined whether we can get enough over the 25 cents, which the rock is worth to us, as to make it desirable for us to sell it.

" Yours truly,

"A. A. CARPENTER."

On the ninth of April, Mr. Foster wrote Mr. Carpenter as follows:

" Yours of the fifth at hand. I expect to be in Chicago on Monday, the twelfth, and think you can arrange a deal on the rock pile that will be satisfactory. Though not much money for a rich mining company, it will be worth looking after for me. Will call at your office about 10 A. M."

The plaintiff then testified that he went to Chicago on the twelfth of April, and saw Mr. Carpenter at his office, and he then said:

"I told him I could sell the ore at $1.50 per ton. 25 cents they were to receive per ton. The costs of loading and the royalty, 15 cents per ton, or 10 per cent. on the price of the sales, as Mr. Carpenter stated it, would leave me a balance of $47\frac{1}{2}$ cents per ton; and the 25 cents per ton I was to pay them for what it was worth at the mine. I showed him the figures right on his desk, and he said it was satisfactory; to go ahead."

Upon his cross-examination, he said that after deducting 15 cents for royalty, 15 cents for loading, and 25 cents for the ore, from the price obtained on sale per ton, it left 95 cents, which was to be divided equally between the plaintiff and defendant; that the defendant was to be allowed half in addition to the 25 cents for the ore.

The foregoing constitutes the contract as stated by the plaintiff, under which he claims the defendant sold to him the pile of rock referred to. In regard to the interview of the twelfth of April, Mr. Carpenter testified that—

"There was not a word passed between us at that interview in regard to the sale of the rock pile. There is not a particle of foundation for it."

That, at the time, the defendant was paying a royalty to the owner of the land of 50 cents per ton; and that he did not know until the twenty-third of April what arrangement could be made per ton on the lean ore. Mr. Carpenter, in his testimony, further says that, in the interview with Mr. Foster on the twelfth of April,—

"I said to Mr. Foster just what I have said in these letters,—that the rock pile was worth to us 25 cents [per ton] as it lay. Add to that the cost of loading on the cars, and paying the royalty,—which I did not know what it would be, —and if he could find a purchaser of it, so that we could get anything more out of it, all right; he should have half of it. At that time there was not a word passed between Mr. Foster and me about the sale of the rock pile to him, and there never has been from that time to this."

In the foregoing we have the version of both parties as to

what was done and said on the twelfth of April while they were together, and when the contract was made according to the plaintiff's theory, if one ever was made between them, and from which he claims an absolute sale of the rock pile to him. After this interview, and it would appear on the same day, Mr. Carpenter wrote the plaintiff, saying that he had written to the canal company about royalty on the rock pile; and then said:

"As I come to think the matter over while writing them, I conclude we must not sell any of it until we have an arrangement about the royalty, and have written them that we should not sell it until we have their consent; so you must not sell any of it until we have their consent."

On the twenty-second of April, Mr. Foster wrote Mr. Carpenter that—

"The Iron River Furnace Company wish some of the rock at once. Can I begin shipping them five cars a day? Please advise by telegram on receipt of this, and write by mail."

Mr. Carpenter sent a telegram to Foster saying the superintendent of the company, Moore, might comply with the request, and also wrote him to the same effect on the twenty-third. The plaintiff then says Mr. Moore loaded five cars next day, and, the day after, Carpenter came to the mine, and witness requested Carpenter to allow him to load his own cars, and the request was acceded to, and he then with his own men loaded the remainder of 72 cars. Explanatory of this, however, is the following letter, written by Mr. Foster on the twenty-fourth of April:

"*Dear Sir:* Yours of the twenty-third is at hand. Your telegram received last night, and this morning I requested Mr. Moore to load five cars per day until further notice, and he said he would. The price I named to them was $1.50 on cars here, expecting the royalty to be not over 15 cents. You did not state whether you had heard from the canal company or not. I would prefer to do the loading myself, as it will require considerable attention, and I have requested Mr.

68 MICH.—13.

Lindsley to put in another track, so as not to interfere with your work. Please advise by return mail."

And on the first day of May Mr. Carpenter wrote Mr. Foster as follows:

"*Dear Sir:* On the twenty-third ult. I accepted of Charles Himrod & Co., of this city, an order to deliver to the Iron River Furnace Co. 500 tons of the rock from the pile at the Ludington mine, not knowing at that time what the price was that you had named to them. When I saw you, you told me the price was $1.50, and, as you had previously said you thought the rock would run about .40 per cent. iron, this price was satisfactory; but, from analysis that we have since made, we think the rock will run about 50 per cent. iron, and will sell no more of it until we have had further tests as to this fact; and I will say, further, that my arrangement with you as to the part of the money for which the rock should sell that you were to have was based upon the supposition that the rock would only run about 40 per cent. iron, and was only worth say $1.50 a ton; but, if it is worth say $2.50 a ton, then I do not think you should or would expect so great a proportion of the results of the sales as we talked about."

This was responded to on May 3 by Mr. Foster as follows:

"*Dear Sir:* Yours of May 1 at hand, and I assure you I am surprised at its contents. I was not aware that Himrod & Co., of Chicago, were purchasing agents for the Iron River Furnace Company; and on what grounds you would sell to them, after having sold the pile to me, I am at a loss to know. Your letters say that I can have it at 25 cents per ton, and half the profits above that amount; and your instructions to Mr. Moore, when you were here April 25, were in accordance with your letters to me. I do not see how I can stop shipments after having made sale. I expect to be in Chicago this week, and will call on you."

On the fifth of May, Mr. Carpenter answered, saying that he had written Moore to ship up to 500 tons, and no more until further ordered by him; and also wrote Foster on the same day, further:

"I shall be pleased to see you, and talk over the matter of

the rock pile, and will say that we propose to treat you fairly in the matter ; but must emphatically deny your claim in the letter that we have sold you the rock pile, or any part of it."

The plaintiff also testified that, after the 500 tons were loaded, he was stopped from loading more by the superintendent, and that the lean ore in the rock pile at that time was worth on the cars $2.25 per ton. The declaration was for the value of the rock pile. The record contains all the testimony in the case.

On the part of the plaintiff were sworn, besides himself, Mr. Jones, who had an interest in the pile with the plaintiff, and O. Burlingame, a surveyor and engineer, who testified that the pile by his measurement and estimate contained 173,344 cubic feet, including the 500 tons taken out.

On the part of the defendant were sworn Mr. Stockbridge, Mr. Carpenter, and Mr. Moore; they being the manager, president, and superintendent of the defendant company.

Under the charge of the court, the cause was submitted to the jury, who returned a verdict for the plaintiff for the sum of $7,893.93. The defendant brings the case to this Court for review.

Mr. Foster further, on his cross-examination, testified, in relation to the contract as he claimed it, that the 25 cents per ton, and the one-half of the net sales, was to be paid to the defendant when he received the money from the parties he sold the ore to; that nothing was said in the bargain as to what was to be done in case he could not sell the rest of the ore; that there was no time set within which he was to take the ore away, but the understanding was he was to take it away as he could sell it. Payments were to be made when the ore was sold, at the time of the sale, and collection from the parties sold to,—"at the time the bill was due to the party to whom I sold." Witness further said :

" There was nothing said between me and Carpenter as to

the time of payment; that is the construction I put upon it myself. It was to be paid out of the proceeds of sales."

The firm purchasing the 500 tons sold failed, and nothing seems to have been realized thereon by either party. Foster never sold, so far as appears, or bargained for the sale, of any ore except the 500 tons, and never paid or offered to pay the defendant for any of it. Nor does it appear that he ever demanded or asked to be allowed to take any more away, except when he told Mr. Carpenter, sometime in the summer, that he could sell the rest of the pile at $2.25 if Mr. Carpenter would guarantee it to yield 50 to 55 per cent. iron, which he declined to do.

Upon the subject of possession under the agreement as claimed by the plaintiff, he says:

"As I understand it, I took possession by hiring the men, loading the ore, and shipping it away. That is the only possession."

It appears, also, from his testimony, that the first five cars were loaded by the defendant's men, under the care of Superintendent Moore; and that, at the request of Foster, Carpenter allowed him to procure the men, and load the remaining cars of the 72, because he wished to take charge of the sorting of the ore, and thought he could load the cars the cheapest.

Fifteen errors are assigned upon the record. Two of them, the first and second, relate to the rulings of the court in admitting testimony, and are not discussed by appellant, and are therefore not considered here.

The remaining assignments of error relate to the charge, and the refusals of the court to charge as requested by defendant's counsel. Six of these requests are of first importance. They require a careful examination of all the testimony in the case, and have been the occasion of the extended reference made thereto in this opinion. These requests are as follows :

"1. If the purchase price to be paid depended on the price Foster should get for the ore, on sales to be made by him, it was not a sale, and the plaintiff cannot recover."

"2. There is no evidence of any intention of the parties that the title should pass before the rock should be sorted and delivered in cars, and therefore it must be held that the title did not pass to the plaintiff, and he cannot recover."

"3. There is no evidence of any unlawful conversion of the rock pile, or any part of it, by the defendant, and the plaintiff cannot recover."

"4. There is no evidence of such delivery and acceptance as is necessary to make an oral sale valid, and therefore your verdict must be for the defendant."

"5. There being no contract or memorandum in writing for the sale of that rock pile, there was no valid sale, unless the plaintiff accepted and received part of the goods sold, or gave something in earnest to bind the bargain, or in part payment."

"6. The contract as testified to by the plaintiff was not a contract of sale, and did not pass the title to Foster. The rock never became his property, and he cannot recover."

It will be noticed that each of these requests substantially asks the court to direct a verdict for the defendant. As applied to the facts in this case undisputed, I think either or all of these requests might have been properly given.

It is claimed by both parties that the undivided half of the net proceeds, added to the 25 cents the ore was worth to the defendant for filling, was the amount the defendant was to receive on sales made by the plaintiff. The amount the defendant was to receive for its ore depended, therefore, entirely upon the price at which it could be sold, and the amount that might be collected on the sales made, and both in turn depended upon the ability of the plaintiff to make a sale of the ore at all.

Almost any kind of a contract relating to personal property may be made by the owner, but, when it is intended to pass the title to the property by the contract, there are elements of certainty required in its terms, to give it any validity. The price to be paid by the purchaser should be fixed, and, if

the sale is not to be for cash, the terms of payment must be stated, and the time given within which the price fixed must be paid. *Williamson v. Berry*, 8 How. 544. Unless this is done, the title to the property will not pass, without a clause in the contract whereby they are waived, and nothing of that kind appears in the agreement relied upon in this case. Under it, both the time of payment and the price to be paid are left entirely uncertain, and upon these depended the change of title.

In regard to the second request, I think it is clear, upon all the testimony, that the delivery was to be made upon the cars after the lean ore had been separated from that which was worthless, and of which there was a large quantity,— from 5 to 15 tons in every 500. I find no evidence properly in the case tending to show that the title should pass to any person, except as the ore was delivered upon the cars by the defendant; and it was only delivered there for parties to whom the plaintiff had made sales. It was only the ore which the plaintiff desired to handle, whatever the character of the arrangement was with the defendant, and he could not do this until it was sorted out of the pile of rock, and the latter excluded. It was not susceptible of delivery, until this was done, for any purpose for which it could be used; and without actual delivery, or that which was equivalent to it, and which does not appear in this case, no title could pass to the plaintiff.

It must be recollected, it is an executed contract alone which is necessary to make the plaintiff's case, as he states it in his declaration ; at least, so far as the title to the property is concerned.

I am satisfied of the correctness of the third request, upon the undisputed testimony. So long as the plaintiff had neither the possession, nor the right to it, the defendant could not be guilty. There is no question but that the defendant is the owner, and entitled to the possession, of the

ore, if the plaintiff is not.    It appears without controversy that the rock pile was much richer than either of the parties supposed it to be when the arrangement, such as it was, was made.    And not only the defendant, but the owner of the land upon which the mine was located, in making claims for its royalty, were entitled to the benefit of the highest price the ore would bring, depending upon its richness; and the plaintiff had no right, under his claimed contract, to sell for less than $1.50 per ton, and I am sure no construction consistent with fair dealing and honesty could fail to give the defendant its proper share of the profits arising from the unexpectedly developed richness of the ore; and, if this is so, its interest would permit it to refuse to deliver the ore, on the request of the plaintiff, until such newly-discovered interest of the defendant was properly protected; and it was only to secure this that defendant refused to comply with plaintiff's requests, notwithstanding the refusal rested upon more impregnable grounds.

The fourth and fifth requests may be properly considered together.    The only facts upon which a delivery is claimed is that the defendant allowed the plaintiff to load a part of the cars containing the 500 tons, and for which neither party has ever yet received a penny, and to the purchaser of which the plaintiff wished to deliver more ore at $1.50 per ton, and which was worth $2.20 per ton, when the defendant refused to deliver any more.    The reason the plaintiff gave for his wishing to load the cars was not that he owned the property to be loaded, but that he could see to the sorting better, and do it cheaper.    The very reasons the plaintiff urges why he should be held to be the owner and possessed of the property are acts and statements of the plaintiff tending strongly to show to the contrary, and preclude all idea of a delivery to the plaintiff.    The whole conduct of the defendant, and the object it had in view in acceding to the plaintiff's wishes in allowing him to load the cars, show very clearly that its pur-

pose was not to make delivery of the oar to the plaintiff, but to enable him better and easier to perform the duties devolving on him in making sale, and assorting the ore preparatory to delivering to the purchaser.

In regard to the fifth request, it appears from the record that nothing was ever given by the plaintiff to the defendant, on the claimed sale of the rock pile, and that no portion of the agreement was ever reduced to writing and signed by either of the parties. And the testimony is not disputed that the contract, whatever it was, was made to be used in Michigan, between parties resident in Michigan, relating to property in Michigan, which was to be selected, weighed, and delivered in Michigan. It was to be performed here; and I have not yet been able to discover why this contract, which is made the basis of this suit, is not within the statute of frauds. In construing it, it is of no consequence where the defendant's agents or servants reside.

The sixth request may be said to include all the rest, and the consideration given to the others necessarily disposes of this. The request should have been granted.

Several errors assigned remain unnoticed which it would not be difficult to sustain, but there is no occasion for considering the case at further length.

The judgment must be reversed, and a new trial granted.

CHAMPLIN and MORSE, JJ., concurred. CAMPBELL, J., did not sit.