## LEE PARISH ET AL. v. MUTUAL BENEFIT LIFE INSURANCE COMPANY.

### Delivered October 12, 1898.

**1. Life Insurance Policy—Application as Part of.**

The application is a part of a contract for life insurance where the policy is issued "in consideration of the statements and agreements in the application which are hereby made a part of this contract."

**2. Same—Forfeiture by Suicide.**

An insurance policy containing a stipulation that it shall be void if the insured commit suicide while sane or insane, is forfeited where the insured died from wounds self-inflicted while confined in jail on a charge of murder, where it is not shown that he was unconscious of his acts or that they were involuntary, or not aimed at self-destruction.

ERROR from Dallas. Tried below before Hon. W. J. J. SMITH.

*T. H. Ball* and *R. K. Craig,* for plaintiffs in error.

*Crawford & Crawford,* for defendant in error.

.BOOKHOUT, ASSOCIATE JUSTICE.—This was a suit by plaintiffs in error, the beneficiaries named upon a policy of insurance issued by defendant company upon the life of William G. Parish.

The defendant set up in defense that the insured committed suicide. That by the terms of the policy and the application made therefor it was provided that if the insured should, within two years after the issuance of the policy, commit suicide, sane or insane, the policy should

become null and void. And that such suicide was committed within the two years. Defendant attached to its amended answer a copy of the application made by the insured, a copy of the policy issued by the defendant, and a copy of the proofs of loss.

Plaintiff replied, excepting to that portion of the answer which set up the condition of forfeiture on the ground of suicide, because it appears from the exhibits attached as copy of the policy and copy of the application, that the clause in said application with reference to suicide was not a warranty, was not the basis, nor did it constitute any part of the basis of said contract of insurance, and was not incorporated into the policy in any such way as to make it an express warranty. But that said clause was in the nature of a representation, and was so made by the assured and so treated by the defendant; was in the nature simply of inducement to the contract, and there is no allegation that it was not made in good faith by the assured as the expression of his then intention, nor is there any allegation that the alleged suicide was committed with any purpose or intent to defraud the defendant.

Plaintiff also denied that deceased did commit suicide, but alleged "that the death of said Parish did not result from any voluntary act of his, but was caused by and was the immediate result of the disease insanity. That at the time and during the occurrence of the acts and personal injuries inflicted upon the said Parish and causing his death, if such was the cause, which plaintiffs, however, deny, and which acts and injuries are erroneously and falsely attributed to and charged against said Parish as suicide, the said Parish was so insane as to be incapable of entertaining an intent and did not intend to destroy his life. That he did not realize the physical nature nor result of such acts, nor contemplate the natural nor probable consequences thereof. That in the doing of said acts, so attributed by defendant to deceased, he, the said deceased, Parish, was impelled and forced thereto by an irresistible impulse. That said acts so charged as suicide against Parish were the acts, and his death the result of the insane frenzy of said Parish, and without any volition or intention on the part of said Parish."

The court overruled plaintiff's exceptions. The cause went. to trial before a jury, and upon the conclusion of the evidence the court instructed the jury to return a verdict for defendant, which was done, and judgment entered accordingly.

Motion for new trial was presented and overruled. Statement of facts was filed.

Within the time allowed by law a petition and bond for writ of error to this court was filed and perfected and the cause brought to this court.

*Opinion.*—The first contention of the plaintiff in error is that the language used in the policy does not make the application itself a part of the policy and the statements and agreements referred to not being set out, the reference, because of its indefiniteness, is inoperative.

The application was read in evidence, and that part bearing upon this

contention reads: "I hereby apply for an insurance of $5000 of the ordinary life alternative plan, premiums payable annually, with the Mutual Benefit Life Insurance Company, on the life of William Grandison Parish, born at Huntsville, State of Texas, on the 22d day of January, 1853, at present and for two years resident of Dallas, county of Dallas, State of Texas. I hereby warrant that he is not intemperate in the use of stimulants or narcotics. I agree that the answers given herewith to the questions of the agent and examiner, which I declare and warrant to be true, shall be the basis of my contract with the company; and that such contract shall at all times and places be held and construed to have been made in the city of Newark, New Jersey.

"I also agree, that if within two years from the date of the policy the insured shall without the written consent of the company reside or travel elsewhere than in or to the United States, Canada, or Europe; or shall within such period, and without such consent, be personally engaged in blasting, mining, submarine operations, or in the making of explosives, or in the service of any railway train, or on a steam or sailing vessel, or in navy or army service in time of war; or within such period shall commit suicide, while sane or insane, the policy hereby applied for thereupon shall become null and void."

The policy referred to this application, using the following language: "That the Mutual Benefit Life Insurance Company, in consideration of the statements and agreements in the application for this policy, which are hereby made a part of this contract, and of the sum of one hundred and fifty-four dollars and twenty cents to it in hand paid by William G. Parish, and of the annual premium of one hundred and fifty-four dollars and twenty cents to be paid, etc., does insure the life of William G. Parish," etc.

It is insisted that the statements and agreements should be set out in this policy, and that the application did not become a part of the contract by the reference made in the policy.

In the case of Fitzmaurice v. Insurance Company, 84 Texas, 61, the Supreme Court, in passing upon a contract of insurance where the policy used almost the identical language in referring to the application that is used in this policy, held the application a part of the policy, and that the insured was bound by the warranties contained in it. In this case the policy is issued "in consideration of the statements and agreements in the application for this policy, which are hereby made a part of this contract," etc. This language was sufficiently definite to constitute the application a part of the contract.

By the terms of this contract the insured warranted that he would not commit suicide within two years from the date of the policy, whether sane or insane.

The plaintiff in error contends under his fifth, sixth, and seventh assignments of error that the court erred in instructing a verdict for defendant, and in refusing instructions requested by plaintiff. This raises the serious question in this case. The defendant pleaded that the

insured, W. G. Parish, committed suicide within two years from the date of the policy, and that by the terms of the contract it was provided that if the insured should within two years after the issuance of the policy, commit suicide, sane or insane, the policy should be null and void. The plaintiff denied that the insured did commit suicide, and further answered, "that the death of said Parish did not result from any voluntary act of his, but was caused by and was the immediate result of the disease insanity. That at the time and during the occurrence of the acts and personal injuries inflicted upon the said Parish and causing his death, if such was the cause, which plaintiffs however deny, and which acts and injuries are erroneously and falsely attributed to and charged against said Parish as suicide, the said Parish was so insane as to be incapable of entertaining an intent, and did not intend to destroy his life. That he did not realize the physical nature nor results of such acts, nor contemplate the natural nor probable consequences thereof. That in the doing of said acts, so attributed by defendant to deceased, he, the said deceased, Parish, was impelled and forced thereto by an irresistible insane impulse. That said act so charged as suicide against said Parish were the acts and his death the result of the insane frenzy of said Parish, and without any volition or intention on the part of said Parish."

The uncontradicted evidence was that the insured took his own life while confined in the county jail of Dallas County, Texas, on the 20th of November, 1893. The contention of the plaintiff in error is that the act of the insured, in order to work a forfeiture of the policy, must have been voluntary and intentional upon his part, and that if he inflicted the injuries in a state of unconsciousness, and under the influence of insane frenzy, that he would not be responsible therefor, and the act would not work a forfeiture of the policy. This contention requires a construction of that part of the contract that if insured within two years from the date of the policy "shall commit suicide, while sane or insane, the policy shall become null and void."

We are not referred to any case in this State where the provision contained in the present policy has been made a consideration by the courts. It was probably the intention of the insurance company in the employment of this language to guard against liability in all cases of self-destruction by the assured, whether at the time he was sane or insane. This language, however, has not this effect. It will not prevent a recovery where death was the result of an accident or mistake. Thus, if the assured should take poison by accident or mistake, this would not be suicide. Life Assurance Society v. Paterson, 41 Ga., 338, same case, 5 Am. Rep., 535; Penfield v. Insurance Co., 85 N. Y., 317, same case, 39 Am. Rep., 660. Nor where death ensues from an overdraught of whisky taken without any intention of destroying his life by one who had become physically and mentally weak by causes beyond his control. Insurance Co. v. Hazelett, 105 Ind., 212, same case, 53 Am. Rep., 192.

The ground upon which it is held that death in such cases does not

forfeit the policy is, that there is no intent on the part of the assured to take his life, and in the absence of an intent his act is not suicide. Pierce v. Insurance Co., 34 Wis., 389; Bacon on Ben. Soc. and Life Ins., sec. 336; 3 Joyce on Ins., sec. 2639.

As stated by the Supreme Court of Michigan, if a person does an act in a state of unconsciousness or involuntarily, whether sane or insane, such act is nothing more nor less than an accident, and would not operate to avoid the policy. Streeter v. Insurance Co., 68 Mich., 199, same case, 8 Am. St. Rep., 883.

On the other hand the policy does cover all conscious acts of the insured by which death by his own hand is compassed, whether he was at the time sane or insane. If the act was done for the purpose of self-destruction, the policy is forfeited and the company is not liable.

In this case, if W. G. Parish inflicted the injuries upon his person for the purpose of and with the intention of self-destruction, no matter whether at the time he was sane or insane, his act would be suicide, and the policy would be forfeited. Bigelow v. Insurance Co., 93 U. S., 284; 3 Joyce on Ins., sec. 2635; 2 Bacon on Ben. Soc. and Life Ins., sec. 336.

It is contended by defendant in error that there is no evidence in the record from which the jury could have drawn the inference that the insured did not understand and contemplate the physical results of his acts, and therefore the court did not err in instructing a verdict for the defendant.

There is evidence that the deceased was a man of good habits, true to his friends, and with a good reputation for honor, integrity, and fair dealing, and that he had filled positions of trust. That he was a man of strong nerve and will power, generally of even, smooth temperament, and exceedingly sensitive about his personal and official honor.

He was arrested and incarcerated in the Dallas County jail on the charge of murder, it being claimed that he had hired a negro to kill his partner. On the night of the first day of his imprisonment he made an attempt to take his life by butting the top of his head against the iron bars of the door of his cell. A witness who was present while the doctor was dressing his wounds says Parish asked the doctor the questions, "How did it happen?" and "What is the matter with me?" This witness testified that Parish did not seem to know how the wounds were inflicted.

There is evidence that the insured was prostrated by the injuries to his head and confined to his bed until his death. On the morning of the 20th of November deceased took a glass dish, in which some fruit had been brought him, and broke it, and with the sharp ragged edge cut a gash across his arm, severing an artery, and cut another gash in the left breast, and then cut his throat.

No witness saw the wounds inflicted, and the insured was dead when first seen by the guard.

There were four physicians who testified in the case as experts in

reference to the sanity of W. G. Parish, and his responsibility for the acts committed.

Dr. Johnson testified: "A highly sensitive man, who thought a good deal of his honor, having occupied high position, upon being accused of murdering his partner and friend, might be impelled to commit a rash act. Such a man, thrown into jail as a common criminal, charged with a grave crime, and who would run against the iron flanges of a jail, producing wounds on the head which confined him to bed for five or six days until the date of his death,—who was suffering mentally, and was physically prostrated from the effects of his wounds, who was to take his life by cutting himself across the arm and chest and jabbing himself in the region of the heart, and cutting his throat, all done with a piece of glass, would not be responsible for his acts. No sane man would mutilate his body in that way."

Witness gave it as his opinion that all suicides were insane, and to eliminate the fact of suicide, there was nothing to indicate an impairment of the mental faculties. "Persons with suicidal tendency know where to strike, and that the blow will result in death."

Dr. McJunkin, another witness, testified: "Having seen Parish under the circumstances I did, and knowing the frame of mind he was in and the facts of the way he killed himself, I am of the opinion that he was insane. I saw him on Sunday at 2 o'clock before he killed himself. I believe he killed himself on Monday. He was, when I saw him, then confined to his bed. In my judgment as a physician, in the physical condition he was in when I last saw him and the condition he had been in for the past week, prostrated on a couch, I do not believe he would have had the physical strength to have butchered himself in the way he was butchered, and in my judgment he was in a frenzy when he did it and not responsible for his act. I don't believe he was himself mentally or physically, and don't believe if he had been he could have done it, as it was reported to me, although as a matter of fact I did not see him." On cross-examination he said: "I believe that when Parish cut himself with the glass, in the manner that I was told he did, that he knew it would kill him, and his acts indicated a deliberate purpose to take his life."

Dr. Thurston, after hearing the case stated, testified: "That he could not see anything in the question that would indicate insanity. The wounds inflicted on himself, according to the testimony I have heard here to-day, indicate more determination than insanity. He evidently knew where the vital points were and exercised reason in his acts. * * * The location of the wounds in the manner in which they were inflicted were shown that he understood the physical consequences of his act. That he was conscious that he would strike himself in the most vital points of the body, and consequently must have known, and did know, from the location of the wounds, where the vital parts were." On cross-examination he testified, "that he is the medical examiner for the defendant company."

Dr. Elmore testified as follows: "Saw Parish on the night he attempted suicide by beating his head against the iron bars; and dressed his wounds. Saw him last on the day he killed himself. The wounds previously inflicted were about well. He was not suffering from any disease and appeared perfectly sane. I saw no disposition to insanity, and the thought never entered my mind during my connection with him. Saw him after he killed himself. There were two wounds in the arm and his throat was cut almost from ear to ear. The windpipe, arteries, and veins were severed. There can be no question about the fact that Parish knew that what he did would kill him."

The proof of loss furnished by the beneficiaries to the company stated that the cause of death was suicide.

The above is the substance of the testimony upon this issue, which it is contended should have been passed upon by the jury.

There is nothing in this evidence tending to show that the act of Parish in inflicting the wounds was involuntary or that he was unconscious when he inflicted them. The evidence may raise a suspicion that at the time the wounds were inflicted Parish was insane, but there is no evidence that the wounds were not inflicted for the purpose of self-destruction.

In this state of the record the trial court properly instructed a verdict for defendant. Joske v. Irvine, 44 S. W. Rep., 1059.

Finding no error in the record, the judgment is affirmed.

*Affirmed.*