34  389
82  264
34  389
87  334

PIERCE vs. THE TRAVELERS' LIFE INSURANCE COMPANY.

LIFE INSURANCE.   (1) *Condition in policy, as to suicide, construed.*  (2) *Accidental death excluded from condition.*

1. By the terms of a life insurance policy, the insurer was not to be liable in case the insured should "die by suicide, felonious or otherwise, sane or insane." *Held*, that these words include every case in which the insured kills himself by a *voluntary* act, the natural, ordinary and direct tendency of which is to produce death, and the physical consequences of which he has sufficient mental capacity to foresee:— in other words, every case of *intentional* self-destruction.
2. It would seem that the words of said condition do *not* include cases of unintentional or *accidental* death, though brought about by acts of the deceased involving *negligence* or carelessness.

APPEAL from the Circuit Court for *Fond du Lac* County.

The action was brought by *Adelaide A. Pierce*, to recover upon a policy of life insurance issued by the defendant to plaintiff's husband, M. B. Pierce, for the benefit of plaintiff, during the existence of which policy Pierce died in St. Louis, December 23, 1871. After his death, proper proofs of death were furnished the defendant company, and payment demanded, which was refused on the ground that the assured had committed suicide. The defendant, by its answer, alleged, among

other things, that the assured died " by his own hand, and committed suicide." The policy of insurance contained the following clause: " Or if he shall become so far intemperate or addicted to any vice or habit as to impair his health, or induce *delirium tremens*, or shall die by suicide, felonious or otherwise, sane or insane,   *   *   *   then this policy shall be null, void, and of no effect."

. Upon the trial, defendant proved by satisfactory evidence that Pierce was found dead in his room in a hotel at St. Louis, from a pistol shot wound directly over the heart, with the pistol lying by his side, discharged. The following letter was found, signed by Pierce and directed to the proprietor of the hotel: " Do as you please with my remains, but my wish is that you take my effects and by their sale realize enough to get me covered up under the snow and frost. My effects will cancel the expenditures. All I want is a box and a hole. I am sheriff of Fond du Lac county, Wisconsin, and I want to be buried before you communicate with my friends. My reason for doing this is the business of nobody but myself."

Plaintiff, in rebuttal, introduced a large mass of testimony, subject to defendant's objection, tending to show that for some months before his death Pierce was of unsound mind.

The court instructed the jury that if they found that the assured came to his death by his own hand at a time when he was insane, and that the act of shooting was not the voluntary act of a sane man, or was not the result of a free volition, or the unconstrained will of a sane mind, then plaintiff was entitled to recover.

Defendant asked for the following instructions, severally and successively: 1. That if the self destruction of the assured was intended by him, he having sufficient capacity at the time to understand the nature of the act which he was about to commit, and the consequences which would result from it, then it was wholly immaterial in the present case that he was impelled thereto by insanity, which impaired his sense of moral

responsibility, and rendered him to a certain extent irresponsible for his actions. 2. That if the assured destroyed his life by shooting himself, and at the time he shot himself did it voluntarily, and intended by such shooting to kill himself, then it was entirely immaterial whether he was at the time sane or insane, or whether his mental faculties were so impaired as to destroy his moral responsibility. 3. That if the assured destroyed his own life by shooting himself, then the presumption was that the condition in the policy was violated, and the plaintiff could not recover, unless she proved that the assured, at the time he shot himself, by reason of mental derangement arising from disease or otherwise, did not comprehend or believe that the shooting would produce death or endanger his life. 4. That if the assured, by his own voluntary act, put himself to death, intending at the time of committing the act, to cause his own death, and being conscious that such would be the probable effect of the means employed by him for that purpose, the policy became void and forfeited, although at the time of so killing himself he was of unsound mind and incapable, by reason of such unsoundness, of distinguishing between right and wrong. 5. That if the assured voluntarily shot himself, then the plaintiff could not recover, and no proof of insanity could take the case out of the condition. All these instructions were refused.

Verdict for the plaintiff, and judgment thereon; from which judgment defendant appealed.

*Gillet & Taylor,* for appellant, insisted that, under the policy, the question of the sanity or insanity of the assured at the time of his death was wholly immaterial. The words "suicide" or "die by his own hand," standing alone and unqualified in a policy, are not restricted in their meaning to a felonious self-destruction, but are held to mean any self-destruction which is voluntary or willful, whether committed by a sane or insane person. No self-destruction is outside of the condition unless committed by mistake, or during a frenzy of insanity which

destroys the mental faculties to such an extent that the person is incapable of judging the effects of his acts. The following authorities support this construction, even in the absence of any such qualifying words as in this case: *Cooper v. Life Ins. Co.*, 102 Mass., 227; *Dean v. Life Ins. Co.*, 4 Allen, 96; *Hartman v. Ins. Co.*, 21 Pa. St., 466; *St. Louis Mut. Life Ins. Co. v. Kennedy*, 6 Bush (Ky.), 450; *Eastabrook v. Ins. Co.*, 54 Me., 224; *Borradaile v. Hunter*, 5 Man. & Gr., 639 (44 E. C. L., 335); *Clift v. Schwabe*, 3 Man. & Gr., 437.

*Priest & Carter*, contra, argued that "voluntary" and "involuntary" were terms appropriately applied to self-destruction, by which to indicate the responsibility or irresponsibility of the act, and that involuntary self-destruction is not suicide in contemplation of law under any circumstances. Only that self-destruction which is the result of acts directed by the will of the party, without being influenced or impelled, and proceeding from choice, not under restraint, is suicide within the legal and common meaning of the term. In *Dean v. Life Ins. Co.*, 4 Allen, 96, the chief justice says: "A party cannot be said to die by his own hand, in the sense in which these words are used in the policy, whose self-destruction does not proceed from the exercise of volition, but 'is the result of a blind impulse of mistake or accident." In *Life Ins. Co. v. Terry*, 15 Wall., 580, the instructions asked by counsel for the company were almost literally identical with those asked in this case, but they were refused, and the supreme court affirmed the judgment. The language of Mr. Justice HUNT in that case clearly sustains the theory of respondent here. He says: "We hold the rule to be — if the death is caused by the voluntary act of the assured, he knowing and intending that this death shall be the result of his act, but when his reasoning faculties are so far impaired that he is not able to understand the moral character, the general nature, consequences and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse which he has not the power to

resist, such death is not within the contemplation of the parties· to the contract, and the insurer is liable."

DIXON, C. J. Beyond the repetition of the language of the condition itself, I do not well see how much, if anything, can be said in favor of the construction which I feel bound to put upon the policy. It strikes me as one of those plain propositions which are understood as soon as asserted, and need only to be asserted to be conceded. The question presented is altogether wide from those discussed and decided in the cases referred to by counsel, though much assistance is to be gained from those discussions in the consideration of it. The words of this condition differ very materially from the words of any of those under consideration in the decisions cited, and neither by the researches of counsel nor by our own has any case been found which presented the question here involved. The question here is not upon the meaning of the expressions, "commit suicide," "take his own life," "die by his own hand," or the like unqualified ones contained in the various policies upon which the cases cited arose, but upon the construction of a condition much more restricted and particular in its language, and containing words which seem to have been introduced for the especial purpose of obviating the uncertainties and avoiding the interpretations which had been sometimes given to the more general expressions above quoted, and by some of the very decisions to which reference has been made by counsel. The question here is not, as in the cases cited, whether the general words above quoted shall or shall not be held to signify a felonious self-destruction or self-murder, for the reason that the language of this condition is so precise and guarded as to clearly and expressly exclude any such consideration. The language of the condition here is, "shall die by suicide, felonious or otherwise, sane or insane." The intention here manifested is so plain as to seem incapable of further explanation, and unless there is something in the

policy of the law which forbids such stipulation, we have nothing to do but to give effect to it. For however the word "suicide," which is held by the authorities to mean the same thing as "death by his own hand" or "take his own life," might, if standing alone, be construed to imply a felonious self-destruction, or self-destruction by a sane man or one capable of understanding the nature and consequences of his own act and of judging between right and wrong, it is obvious that it cannot be so received or applied here. Such construction is forbidden by the express words of the condition, which declare that it shall make no difference whether the suicide was felonious or otherwise, or whether the party committing it was sane or insane at the time. The parties have, therefore, by the very language of the condition, defined the sense in which they used the word; and by that definition the courts must be bound, unless there be something in the condition contrary to public policy or sound morals, which is not pretended.

It seems very clear to my mind, therefore, that the construction and effect of the condition must be the same as that which was given by the majority of the court to the exception in the policy in the leading case of *Borradaile v. Hunter*, 5 Man. & Gr., 639 (44 E. C. L., 335); *S. C.*, 5 Scott N. R., 418, and 2 Bigelow's Life and Acc. Ins. Cases, 280. That is one of the earliest, as well as one of the ablest and most exhaustively considered cases upon the subject. The language of the exception there was, "or shall die by his own hands;" and the majority of the court held that it was not necessary, in order to bring the case within the exception, that the act of self-destruction should have resulted from a criminal intention or purpose, or that the jury should find that the deceased was *felo de se*, or guilty of felony, in order to exonerate the insurer; but that it was enough that it was "the voluntary and willful act of a man having at the time sufficient powers of mind and reason to understand the physical nature and consequences of such act, and having at the time a purpose and intention to cause his own

death by that act; and that the question, whether at the time he was capable of understanding and appreciating the moral nature and quality of his purpose, was not relevant to the in-quiry, further than as it might help to illustrate the extent of his capacity to understand the physical character of the act itself." In short, the majority of the court held that wherever the assured killed himself intentionally, though not feloniously, as by any voluntary act of his, the natural, ordinary and direct tendency or effect of which would be to produce his death, and which act he had at the time sufficient mental capacity to comprehend, and to foresee and estimate its physical consequences, such self-destruction was "death by his own hands," or suicide, within the meaning of the exception contained in the policy. From this conclusion TINDAL, Chief Justice, dissented, stating his reasons in a very able opinion for holding that it was only a felonious self-destruction that was intended by the words of the policy; and his views have been adopted, and have become the basis of several American decisions, which are cited by Mr. Bigelow in a note appended to the principal case, *supra*, p. 303. See also *Life Ins. Co. v. Terry*, 15 Wal., 580. But upon the reasoning of Chief Justice TINDAL, or of any of the cases, it is impossible for me to perceive how the language of the exception now before us can be understood or construed otherwise than as I understand and construe it.

It has been suggested that the construction here given would necessarily lead to the denial of any claim under the policy, if the assured had come to his death in the manner or by any of the means supposed by way of illustration in *Borradaile v. Hunter*, and there considered as not falling within the intent of the exception; as for example, if his death had resulted from an act committed under the influence of delirium, as, if he had in a paroxysm of fever precipitated himself from a window, or, having been bled, removed the bandages, or had taken poison by mistake, and death in either case had ensued. It may be

as true here as it was there, though I think it is not, that the terms of the proviso, in their largest sense, would include every act of self-destruction, or which resulted in the death of the assured, whether intentionally done or not, or accompanied or not accompanied by a purpose to effect his own death, or whether the doing of the act was purely accidental, and such as evinced no design, or the absence of all design, to take life. Still it is as obvious here as it was there, and I think even more so, that this kind of wholly unintentional or accidental self-destruction, which never received and never deserved the name of "suicide," is not within the spirit or intent of the proviso. The use of the word "suicide" in this condition indicates with greater clearness and certainty than any words found there, that such was not the intention of the insurance company. Deaths of the kind last above spoken of, or produced as there stated, are more properly denominated deaths by accident than deaths by suicide, and the circumstances attending them would clearly not be such as the parties contemplated at the time of entering into the contract, and therefore should not, as it clearly seems to me, be held within the intent of this condition, any more than within that in *Borradaile v. Hunter*. Deaths so caused are held to be deaths by accident, within the meaning and purpose of policies of insurance against accident, as where a man negligently "draws a loaded gun towards him by the muzzle, or the servant fills the lighted lamp with kerosene, and the gun is discharged, and the lamp explodes," which are the cases put by way of illustrating what constitutes an accident in an action upon such a policy, in *Schneider v. Provident Life Ins. Co.*, 24 Wis., 28; *S. C.*, 1 Bigelow, 731, and 1 Am. R., 157. The condition here relieves the company from liability only where the self-destruction was intentional, or committed by a party who was conscious of the nature of the act he was committing or about to commit, and conscious of its direct and immediate consequences, though the act may have been unaccompanied by any criminal or felonious intent or

purpose. It does not apply or relieve the company where the death of the assured was accidental, or may be properly said to have been caused by accident, though brought about, it may be, by his own hands or by some dangerous or destructive instrument held in them.

It follows from these views that the court below erred both in its instructions and its refusals to instruct respecting the question first above discussed, and that the judgment appealed from must be reversed, and the cause remanded for a new trial according to law.

_By the Court._— It is so ordered.