## BIGELOW v. BERKSHIRE LIFE INSURANCE COMPANY.

In an action against it upon a policy of life insurance, which provided that it should be null and void if the insured died by suicide, "sane or insane," the company pleaded that he "'died from the effects of a pistol-wound inflicted upon his person by his own hand, and that he intended, by inflicting such wound, to destroy his own life." *Held,* that a replication setting up that, "at the time when he inflicted said wound, he was of unsound mind, and wholly unconscious of his act," is bad.

ERROR to the Circuit Court of the United States for the Northern District of Illinois.

This is an action on two policies issued by the defendant on the life of Henry W. Bigelow. Each contained a condition in avoidance, if the insured should die by suicide, *sane or insane;* and in such case the company agreed to pay to the party in interest the surrender value of the policy at the time of the death of Bigelow. The defendant pleaded that Bigelow died from the effects of a pistol-wound inflicted upon his person by his own hand, and that he intended by this means to destroy his life. To this the plaintiffs replied, that Bigelow, at the

time when he inflicted the pistol-wound upon his person by his own hand, was of unsound, mind, and wholly unconscious of the act. A demurrer to this replication was sustained by the court below, and the plaintiffs bring the case here for review.

Argued by *Mr. Thomas Hoyne* for the plaintiff in error.

An act of self-destruction has never been held to avoid a policy of life insurance, when the insane person has been so unsound of mind as to be unconscious of the act he was committing. *Borradaile* v. *Hunter*, 5 Mann. & Gr. 639; *Hartman* v. *Keystone Ins. Co.*, 21 Penn. 466; *Dean* v. *Mutual Life Ins. Co.*, 4 Allen, 96; *Cooper* v. *Mass. Life Ins. Co.*, 102 Mass. 227; *Eastbrook* v. *Union Ins. Co.*, 54 Me. 224; *Breasted* v. *Farmers' Loan and Trust Co.*, 4 Hill, 73; 4 Seld. 299; 2 Bigelow, Life Ins. Cas. 4; Bliss, Life. Ins., sect. 243, p. 415; *Pierce* v. *Travellers' Ins. Co.*, 3 Ins. Law J. 422; *Van Zandt* v. *Mutual Benefit Life Ins. Co.*, 55 N. Y. 177.

In all cases, sane or insane, the law allows the plaintiff to show that death was not intended by the deceased; but that it was an involuntary act, or a result of mental disease. *Borradaile* v. *Hunter*, *supra*; *Hopps' Case*, 31 Ill. 392.

The decided cases all establish that only persons capable of discriminating the particular act are to be held in law accountable. *Van Zandt* v. *Mutual Benefit Life Ins. Co.*, *supra*; Bliss, Life Ins., *supra*; *Pierce* v. *Travellers' Ins. Co.*, *supra*; *Breasted* v. *Farmers' Loan and Trust Co.*, *supra*; *Life Ins. Co.* v. *Terry*, 15 Wall. 580, and cases there cited.

A suicide, " sane or insane," is a connection of words without meaning, if taken apart from their literal signification, or out of the context. Their real meaning as they stand connected with the other words of the proviso is, that, if the insured *be sane or insane* at the time he intentionally commits suicide, *i.e.*, self-murder, the policy is to be void and of no effect.

Even if it be conceded that a death self-inflicted, whether a *suicide* or not, is within the terms of the policy, yet the *fact* that the death was not *intentional*, by reason of the insured's *mental unconsciousness of his act*, would clearly render the company liable.

*Mr. H. G. Miller, contra.*

MR. JUSTICE DAVIS delivered the opinion of the court.

There has been a great diversity of judicial opinion as to whether self-destruction by a man, in a fit of insanity, is within the condition of a life policy, where the words of exemption are that the insured "shall commit suicide," or "shall die by his own hand." But since the decision in *Life Ins. Co.* v. *Terry*, 15 Wall. 580, the question is no longer an open one in this court. In that case the words avoiding the policy were, "shall die by his own hand;" and we held that they referred to an act of criminal self-destruction, and did not apply to an insane person who took his own life. But the insurers in this case have gone further, and sought to avoid altogether this class of risks. If they have succeeded in doing so, it is our duty to give effect to the contract; as neither the policy of the law nor sound morals forbid them to make it. If they are at liberty to stipulate against hazardous occupations, unhealthy climates, or death by the hands of the law, or in consequence of injuries received when intoxicated, surely it is competent for them to stipulate against intentional self-destruction, whether it be the voluntary act of an accountable moral agent or not. It is not perceived why they cannot limit their liability, if the assured is in proper language told of the extent of the limitation, and it is not against public policy. The words of this stipulation, "shall die by suicide (sane or insane)," must receive a reasonable construction. If they be taken in a strictly literal sense, their meaning might admit of discussion; but it is obvious that they were not so used. "Shall die by his own hand, sane or insane," is, doubtless, a more accurate mode of expression; but it does not more clearly declare the intention of the parties. Besides, the authorities uniformly treat the terms "suicide" and "dying by one's own hand," in policies of life insurance, as synonymous, and the popular understanding accords with this interpretation. Chief Justice Tindall, in *Borradaile* v. *Hunter*, 5 Mann. & Gr. 668, says, "The expression, 'dying by his own hand,' is, in fact, no more than the translation into *English* of the word of *Latin* origin, 'suicide.'" Life insurance companies indiscriminately use either phrase, as conveying the same idea. If the words, "shall commit suicide," standing alone in a policy, import self-murder, so do the words, "shall die by his own hand."

Either mode of expression, when accompanied by qualifying words, must receive the same construction. This being so, there is no difficulty in defining the sense in which the language of this condition should be received. Felonious suicide was not alone in the contemplation of the parties. If it had been, there was no necessity of adding any thing to the general words, which had been construed by many courts of high authority as not denoting self-destruction by an insane man. Such a man could not commit felony; but, conscious of the physical nature, although not of the criminality, of the act, he could take his own life, with a settled purpose to do so. As the line between sanity and insanity is often shadowy and difficult to define, this company thought proper to take the subject from the domain of controversy, and by express stipulation preclude all liability by reason of the death of the insured by his own act, whether he was at the time a responsible moral agent or not. Nothing can be clearer than that the words, " sane or insane," were introduced for the purpose of excepting from the operation of the policy any intended self-destruction, whether the insured was of sound mind or in a state of insanity. These words have a precise, definite, well-understood meaning. No one could be misled by them; nor could an expansion of this language more clearly express the intention of the parties. In the popular, as well as the legal, sense, suicide means, as we have seen, the death of a party by his own voluntary act; and this condition, based, as it is, on the construction of this language, informed the holder of the policy, that, if he purposely destroyed his own life, the company would be relieved from liability. It is unnecessary to discuss the various phases of insanity, in order to determine whether a state of circumstances might not possibly arise which would defeat the condition. It will be time to decide that question when such a case is presented. For the purposes of this suit, it is enough to say, that the policy was rendered void, if the insured was conscious of the physical nature of his act, and intended by it to cause his death, although, at the time, he was incapable of judging between right and wrong, and of understanding the moral consequences of what he was doing.

Insurance companies have only recently inserted in the provisos to their policies words of limitation corresponding to

those used in this case.   There has been, therefore, but little occasion for courts to pass upon them.   But the direct question presented here was before the Supreme Court of Wisconsin in 1874, in *Pierce* v. *The Travellers' Life Insurance Company,* 34 Wis. 389, and received the same solution we have given it.   More words were there used than are contained in this proviso; but the effect is the same as if they had been omitted.   To say that the company will not be liable if the insured shall die by "suicide, felonious or otherwise," is the same as declaring its non-liability, if he shall die by "suicide, sane or insane."   They are equivalent phrases.   Neither the reasoning nor the opinion of that court is at all affected by the introduction of words which are not common to both policies.

It remains to be seen whether the court below erred in sustaining the demurrer.   The replication concedes, in effect, all that is alleged in the plea; but avers that the insured at the time " was of unsound mind, and wholly unconscious of the act."   These words are identical with those in the replication to the plea in *Breasted* v. *Farmers' Loan and Trust Company,* 4 Hill, 73 ; and Judge Nelson treated them as an averment that the assured was insane when he destroyed his life.   They can be construed in no other way.   If the insured had perished by the accidental discharge of the pistol, the replication would have traversed the plea.   Instead of this, it confesses that he intentionally took his own life; and it attempts to avoid the bar by setting up a state of insanity.   The phrase, " wholly unconscious of the act," refers to the real nature and character of the act as a crime, and not to the mere act itself.   Bigelow knew that he was taking his own life, and showed sufficient intelligence to employ a loaded pistol to accomplish his purpose; but he was unconscious of the great crime he was committing.   His darkened mind did not enable him to see or appreciate the moral character of his act, but still left him capacity enough to understand its physical nature and consequences.

In the view we take of the case, enough has been said to show that the court did not err in holding that the replication was bad.                              *Judgment affirmed.*