## Lawrence Nelson, Adm'r, v. The Equitable Life Assurance Society of the United States.

| 73 | 133 |
|---|---|
| 84 | 179 |
| 73 | 133 |
| f99 | ²634 |
| 73 | 133 |
| 100 | ³195 |
| 73 | 133 |
| 106 | ²453 |
| 106 | ³453 |

1. INSURANCE—*Execution of Application—The Evidence Held to Make Prima Facie Proof of.*—The court reviews the evidence in regard to the execution of an application for insurance and holds that it makes *prima facie* proof of the signature of the insured and is sufficient to allow the application to be admitted in evidence.

2. SAME—*The Phrase "Suicide, Sane or Insane" Construed.*—In a suit on an insurance policy containing "the sane or insane clause" in reference to death by suicide, it is not necessary in order to avoid liability, to show that a person taking his own life was conscious of the moral quality or consequences of the act, but only that he knew the physical nature and consequences of the act, that is that he knew that the means employed would cause death or endanger his life.

3. SAME— "*Suicide, Sane or Insane*"—*Instructions in Regard to Considered.*—In a suit on an insurance policy exempting the insured from liability if the insured should commit suicide "sane or insane" the phrases, "should intentionally commit suicide," "intended to take his own life," "did it voluntarily and intended thereby to take his own life," "intentionally took his own life" and "voluntarily shot himself," in instructions given with reference to the liability of the defendant under the "sane or insane" clause, are held to be too general in their nature and ambiguous and liable to mislead the jury.

4. SAME—*The Application as Part of the Policy—Where a New Policy is Issued.*—In a suit on an insurance policy containing a clause making the application therefor a part of the policy, it appeared that the policy sued on was issued in place of the original policy issued on the application introduced in evidence as the one referred to, and that no formal application for the new policy was ever made. *Held,* that it was competent for the insurer to show that both parties understood the reference to be to the application for the original policy, but that in the absence of any proof other than the reference itself, it could not be so held.

5. BURDEN OF PROOF—*Of Insanity in a Suit on an Insurance Policy.*—In a suit on an insurance policy exempting the insurer from liability in case of suicide, where it is shown that the insured died by his own hand, the burden is on the plaintiff to show that the insured did not know the physical nature and consequences of his act.

6. PRACTICE—*Counter Affidavits on Motions for a New Trial.*—On a motion for a new trial on the ground of newly discovered evidence counter affidavits should not be received; the motion should be heard upon ex parte affidavits.

Assumpsit, on insurance policy. Appeal from the Circuit Court of Cook County; the Hon. EDMUND W. BURKE, Judge, presiding. Heard in this court at the October term, 1897. Reversed and remanded. Opinion filed January 6, 1898.

BASTRUP & O'NEILL, attorneys for appellant.

OTIS H. WALDO, attorney for appellee.

MR. JUSTICE WINDES DELIVERED THE OPINION OF THE COURT.

Appellant as administrator of the estate of Vigo Alfred Andersen, deceased, brought suit against appellee on a life insurance policy issued by appellee on the life of said Andersen under date of August 1, 1894. A trial before the Circuit Court and a jury resulted in

a verdict and judgment for defendant, from which this appeal is taken.

The questions, presented which we deem necessary for a decision of the case are: First, whether the trial court erred in the admission of the application of deceased for the policy; second, whether there was error in the instructions given the jury; and third, whether there was error in refusing appellant's motion for a new trial because of newly discovered evidence.

Said Andersen died January 29, 1895, from the effect of a pistol wound in his right temple, the fatal shot being fired by his own hand.

The declaration contained a special count, which set up the policy in *haec verba*, and certain conditions printed on the reverse side thereof, which provided that if Anderson performed the promises and undertakings of said policy on his part, then upon his death appellee should pay to him, his executors, etc., $9,455.40, in thirty equal annual installments, as therein provided, or in lieu of said installments, $6,000 in one sum, and also the common counts.

Appellee pleaded the general issue and pleas, setting up an application on which it was alleged said policy was issued, and which application, it was alleged, was a part of the consideration for the issuance of said policy, and a part of the contract of insurance; that said application provided, among other things, "that the death of said Andersen by self destruction, sane or insane, within one year from the issuance of said policy, was excepted from the risks assumed" by appellee, and that said Andersen did within one year from the issuance of said policy, commit suicide, and also that within the same time said Andersen wrongfully, and of his own volition, destroyed his own life; also pleas alleging that said Andersen in said application warranted that all statements therein, and answers

by him made therein to the medical examiner, were true, and alleging that certain statements made therein by said Andersen were untrue to his knowledge, and constituted misrepresentations, and a breach of such warranty. Replications by appellant traversed said pleas, respectively, and also set up fraudulent representations by agents of appellee to procure said application. During the course of the trial appellee was allowed to withdraw the general issue, and file rejoinders to plaintiff's replications, in which said fraudulent representations were set up, denying the same.

Appellant offered evidence tending to establish a *prima facie* case of right to recovery on said policy, and rested.

Appellee then in the course of its evidence produced a paper, partly written and partly printed, purporting to be an application for insurance by said Andersen to appellee. This application was offered in evidence, after preliminary proof as to its execution, to which offer appellant objected, on the ground that the execution had not been proved. The objection was overruled, and appellant excepted. A medical examiner's report, made in connection with the negotiations of said Andersen for the issuance of said policy, was proven to have been signed by said Andersen, and admitted in evidence without objection. A witness, Babcock, who was the Chicago manager of appellee, testified that said application came to his hands in the regular course of business, that he caused it to be copied and sent to the home office of appellee at New York, and that it was the application on which the policy sued on was issued.

A witness, Haviland, who was application clerk in the employ of appellee, testified that in the regular course of business he received said medical examiner's report and said application, wrote the name of the

agent, J. A. Holquist, on the top of the report, and saw that the inspector, J. G. Berry, received the two papers pinned together.

A son of said Andersen called by appellee, testified that he was not sure that the signature to the application was the signature of his father. Annie Ashby, called by appellee, testified that she had seen said Andersen write his name two or three times about Christmas before his death in January following, and on being shown the signature on said application, being the name of said Andersen, answered, "Well, that looks like it, but he used to do it in pencil."

Two other witnesses, experts in the matter of signatures, being bank tellers of long experience, on being shown the signature to the medical examiner's report, which had been previously proven to be that of Andersen, and which was in evidence, and also the signature (being the name of Andersen) on said application, testified that they had examined the same under a magnifying glass, and that in their judgment the signatures were written by the same person.

We think this evidence made a *prima facie* proof of the signature of Andersen sufficient to allow said application in evidence.

But appellant's counsel made the further specific objection to the admission of said application in evidence, viz.: "We also object to this for the further specific reasons that on the face of the instrument itself it is ambiguous, uncertain, and calculated to deceive and mislead the applicant for insurance, Vigo Andersen, in this, that in the sixth question of what purports to be page 2 of said alleged application, the same page on which the signature of Vigo Andersen is claimed to be now, that this language occurs: 'If an installment policy is desired, state whether the amount of the policy, or any sum or sums that may become due

under any of the privileges and conditions granted in the policy herein applied for, is to be paid by the society in ten, fifteen, twenty, twenty-five or thirty equal annual installments? In——equal annual installments,' and also this language occurring further down upon the same page: 'I have noted the provisions embodied in the privileges and conditions printed on the other side of this sheet, and hereby apply for a policy containing said provisions, and I hereby agree that the application and the policy hereby applied for taken together shall constitute the entire contract between the parties hereto; that all the foregoing statements and answers, as well as those made or to be made to the society's medical examiner, are warranted to be true; that this contract shall not take effect until the answers, as well as those made or to be made to the society's medical examiner are warranted to be true; that this contract shall not take effect until the first premium shall have been duly paid during my good health, and that the distribution of surplus which may be adopted and approved by the society is hereby accepted by me in my own behalf, and for every person who shall have any interest in the policy now applied for.' 'Dated at Chicago, Aug. 1, '94,' with the name 'Vigo Andersen' in writing, and in print below, 'Signature of the person for whose benefit assurance is made.'.

"Again, the name 'Vigo Andersen' in writing, and in print, 'The person whose life is to be assured.'

"Our specific objection here relates then to the conflict upon the face of this paper called 'The application,' as to what are the privileges and conditions that the applicant for insurance must take notice of and be bound by as a part of the contract of insurance, and also because the clause that I have last read, occurring at the bottom of page 2 of said application states, 'that

the privileges and conditions contained on the reverse side of page 2, and on what is called page 1, the front page, will be the privileges and conditions of the policy to be issued by the company.

"For these reasons, your Honor, we object and except to the introduction of this application in evidence.

"THE COURT. The paper is allowed.

"Objection overruled and exception."

After a careful and critical examination of said application in the record (it not being set out in the abstract), we are, if we understand the scope of the objection, unable to see wherein it is ambiguous, uncertain, and calculated to deceive and mislead the applicant for insurance in the respects indicated by counsel's objection, or in any respect, and therefore think that there was no error in admitting it in evidence, and that if this was the application on which the policy in question issued, that it was a part of the contract of insurance.

Appellant complains that the court erred in giving to the jury for appellee instructions marked $14\frac{1}{2}$, 2 to 9, inclusive, and 11, 12, 15 and 16. Instruction $14\frac{1}{2}$ is, viz.: "The jury are instructed that if they shall believe from the evidence that the said Vigo Alfred Andersen, in answer to a question put to him by the medical examiner, stated that he had never been affected with mental derangement, and if the jury shall further believe that this statement or answer was false, in any respect deemed by the jury material, then the said policy of insurance is void, and the jury shall find for the defendant."

There was no evidence offered from which the jury could have found that said Andersen had been affected with mental derangement prior to the medical examination, and said instruction should not, therefore, have been given. The only evidence referred to by appellee's counsel as justifying this instruction is that of Ander-

sen's son on cross-examination, in which he said that he had testified before the coroner that his father was insane three days in Copenhagen, but that he would not swear to it—that it was only something he had heard.

The other instructions complained of are, viz.:

"2. The jury are instructed that the application signed by Vigo Alfred Andersen in the name of 'Vigo Andersen,' and the policy of insurance issued by the Equitable Life Assurance Society of the United States to said Vigo Alfred Andersen, together constitute the entire contract of insurance between the said Vigo Alfred Andersen and said Equitable Life Assurance Society of the United States, and the plaintiff, if he recovers at all, in this action, must recover upon this entire contract.

"3. The jury are instructed as a matter of law, that the expression, 'Self-destruction, sane or insane, within one year from the date of the issuance of the policy, are not risks assumed by the society in this contract,' as used in the application in evidence in this case, meant, that if the said Vigo Alfred Andersen should intentionally commit suicide within one year after the date of the issuance of the said policy, whether he be sane or insane at the time, no recovery could be had against the said Equitable Life Assurance Society of the United States upon the policy of insurance issued to the said Vigo Alfred Andersen."

"4. The court instructs you, that if you shall believe from the evidence in this case that the said Vigo Alfred Andersen took a loaded revolver, placed the muzzle to his head, shot himself, thereby destroying his own life, you are entitled to take these facts, together with all the other evidence in the case into consideration in determining whether or not the said Vigo Alfred Andersen intended to take his own life, and whether or not he had sufficient

capacity to *understand the physical nature and consc-quences of his act.*

"5.   The jury are instructed that if they shall believe from the evidence that the said Vigo Alfred Andersen destroyed his own life, and that such self-destruction was intended by him, and that he had sufficient capacity at the time to understand the nature of the act which he was about to commit and the consequence which would result from it, then it was wholly immaterial in the present case whether or not he was impelled thereto by insanity which impaired his sense of moral responsibility, then and in that case the plaintiff herein can not recover.

"6.   The jury are instructed that if they shall believe from the evidence that the said Vigo Alfred Andersen, by his own voluntary act, put himself to death, intending at the time of committing the act to cause his own death, and being conscious that such would be the probable effect of the means employed by him for that purpose, the plaintiff in this suit can not recover, although at the time of so killing himself he was of unsound mind and incapable by reason of such unsoundness to distinguish between right and wrong.

"7.   The jury are instructed that if they shall believe from the evidence in the case that the said Vigo Alfred Andersen destroyed his own life, and that at the time of such self-destruction he had sufficient capacity to *understand the physical nature of the act* which he was about to commit and the *consequences which would result from it*, then in that case the plaintiff can not recover on the contract of insurance declared on in this case.

"8.   The jury are instructed that if they believe from the evidence that the said Vigo Alfred Andersen destroyed his life by shooting himself, and that at the time he shot himself *did it voluntarily and intended by such shooting to kill himself*, then it was entirely imma-

terial whether he was at the time sane or insane, or whether or not his mental faculties were so impaired as to destroy his moral responsibility, and the plaintiff can not recover in this action.

"9. The jury are instructed that if the said Vigo Alfred Andersen destroyed his own life by shooting himself, then *the presumption* is that the condition in the said *contract* of insurance *was violated* and the plaintiff can not recover, unless you further believe that at the time he shot himself by reason of mental derangement, arising from disease or otherwise, said Vigo Alfred Andersen *did not comprehend or believe that the shooting would produce death or endanger his life.*

"11. The jury are instructed that if they shall believe from the evidence that the said Vigo Alfred Andersen *intentionally took his own life,* the plaintiff in this suit can not recover, even though the jury shall further believe from the evidence that at the time of his so taking his own life the reasoning faculties of the said Vigo Alfred Andersen were so far impaired by anger, pride, jealousy or a desire to escape the ills of life, that he was not able to understand the moral character of the act he was about to commit.

"12. The jury are instructed, that if they shall believe from the evidence the said Vigo Alfred Andersen voluntarily shot himself, then the plaintiff can not recover, *and no proof of insanity will take the case out of the condition of the said contract of insurance.*

"15. The court instructs you as a matter of law, that Vigo Alfred Andersen must be presumed to have been sane at the time of the commission of the act of shooting, unless his insanity is proved by a preponderance of the evidence.

"16. The court instructs you as a matter of law, that sanity being the normal condition of a person, the burden of proving that Vigo Alfred Andersen was

insane at the time of the commission of the act of shooting, if you believe from the evidence that he shot himself, is upon the plaintiff in this action, and must be proved by a preponderance of the evidence."

The second instruction was not so erroneous in not leaving the jury to determine whether the application was signed by said Andersen as to justify a reversal on that ground; there was no evidence that he did not sign it, and as we have seen, there was proof sufficient of his signature to allow it to go to the jury. This, and all the instructions following it, appellant claims are erroneous because suicide is no defense to this suit, and this contention arises out of the clause in the application for the policy, which, if it was the application on which the policy issued, is a part of the contract of insurance. It provides that the *death of said Andersen by self-destruction, sane or insane, within one year from the issuance of said policy, was excepted from the risk assumed by appellee.*

In a recent case, Grand Lodge, etc., v. Wieting, 168 Ill. 408, where the question arose as to the liability of appellant, the defense being that the insured intentionally took his own life, on the following clause in the insurance certificate, viz.: "Provided, however, that should the said William Wieting commit suicide, then and in that case only the amount paid by the said William Wieting into the beneficiary fund by virtue hereof, shall be paid to the beneficiaries above mentioned, which said amount shall be in full of all demands whatsoever arising out of or under this beneficiary certificate," the Supreme Court say: "It is believed there is a substantial concurrence of judicial decision in America on the proposition that if, at the time of the suicidal act, the assured was so affected with insanity as to be unconscious of the act or the physical effect thereof, or was driven to its commission by an insane

impulse which he had not the power to resist, the act of self-destruction is regarded as though it were the result of accident of some irresistible external force, and the proviso of a policy *framed as the one at bar, or where other phrases denoting self-destruction are used, will not attach, but the insurer will be held liable.*

"There is much conflict of opinion and authority as to the effect of the condition or proviso of the policy when insanity had so far overcome the consciousness of the assured as that he is unable to appreciate the moral wrong involved in the act of taking his own life, though he had mind enough to intend the act and was aware of its physical effect. The Supreme Court of the United States is committed to the doctrine that in order to relieve the insurer from liability because of a proviso of the character here involved, there must have been sufficient mental understanding to realize the moral turpitude of the act of self-destruction. Life Ins. Co. v. Terry, 15 Wall. 580; Bigelow v. Berkshire Life Ins. Co., 93 U. S. 284; Manhattan Life Ins. Co. v. Broughton, 109 U. S. 121.

"In Life Ins. Co. v. Terry, *supra*, after a full review of previous decisions, the court remarked: 'We hold the rule on the question before us to be this: If the assured, being in the possession of his ordinary reasoning faculties, from anger, pride, jealously, or a desire to escape from the ills of life, intentionally takes his own life, the proviso attaches, and there can be no recovery. If the death is caused by the voluntary act of the assured, he knowing and intending that his death shall be the result of his act, but when his reasoning faculties are so far impaired that he is not able to understand the moral character, the general nature, or consequences and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse, which he has not the power to resist, such death is not within the

contemplation of the parties to the contract, and the insurer is liable.'

"This view has met the approval of the court of last resort in the States of New York, Pennsylvania, Maryland, Vermont, Tennessee, Georgia, Michigan and Ohio (citing cases), and upon principle, as well as what seems to be the prevailing judicial sentiment in the United States, we accept and adopt it."

It will be observed that the court is careful to limit its decision to "a proviso of a policy framed as the one at bar"—the case then at bar—that is, a proviso without what is known in the books as "the sane or insane clause."

In Joyce on Insurance, Vol. 3, Sec. 2635, the author says: "In order to avoid the question as to what is meant by the words 'suicide' or 'death by his own hand,' or by words of like effect, the insurers have generally added the words 'sane or insane,' to the proviso. Under these words, it is held that if the insured kills himself, the policy is avoided, though he may have been of unsound mind and wholly unconscious of the moral nature of the act done. Thus where a policy of life insurance provided that in case of the death of the insured by his own act and intention whether 'sane or insane,' the company should be liable only for the net value of the policy at that time. It was held that this provision embraced an intentional self-destruction by a man so far insane that he was conscious at the time of the physical nature and consequences of his act and wanted to destroy his life, even though he was not conscious of the moral quality and consequences of the act.

In the Michigan case the proviso was 'died by his own hand, sane or insane,' and the court, per Champlin, J., approved the opinion of DAVIS, J., in Bigelow

v. Berkshire Life Ins. Co., 93 U. S. 284, and declared that "the policy governs all conscious acts of the insured by which death by his own hand is compassed, whether he was at the time sane or insane. If the act was done for the purpose of self-destruction, it matters not that the insured had no conception of the wrong involved in its commission."

In Bigelow v. Berkshire Life Ins. Co., 93 U. S. 284, in which the policy contained the clause, 'shall die by suicide, sane or insane,' and which case is cited with approval in the Wieting case, *supra*, by the Supreme Court, DAVIS, J., of the Supreme Court of the U. S., said: "For the purposes of this suit, it is enough to say that the policy was rendered void if the insured was conscious of the physical nature of his act, and intended by it to cause his death, although at the time he was incapable of judging between right and wrong or of understanding the moral consequences of what he was doing."

To the same effect are the following cases: Pierce v. Travellers' Ins. Co., 34 Wis. 389; Union, etc., Ins. Co. v. Hollowell (Ind.) 43 N. E. Rep. 277.

It thus is clear that when the policy contains "the sane or insane clause," it is not necessary, in order to avoid liability, to show that a person taking his own life was conscious of the *moral quality or consequences of the act,* but only that he was conscious at the time of the *physical nature and consequences of the act,* that is, that he knew that the means he employed would cause death or endanger his life. Some of the cases go further, and hold that under this clause it is immaterial whether the assured even knew the physical consequences of his act, but we think that should be shown in order to avoid liability by the insurer. In any event, this was the theory of appellee's defense in this case.

Tested by this rule, all the instructions above noted,

given with reference to the liability of appellee, under said "sane or insane clause" were proper, unless the words used in the third instruction, "should intentionally commit suicide," in the fourth, "intended to take his own life," in the eighth, "did it voluntarily and intended by such shooting to kill himself," in the eleventh, "intentionally took his own life," and in the twelfth, "voluntarily shot himself," are too general in their nature and ambiguous, and therefore liable to mislead the jury, because not made clear and specific, as was done, for instance, in the fifth instruction by the addition of the qualification that deceased had sufficient capacity to understand the nature of the act which he was about to commit, and the consequences which would result from it.  We are inclined to think these instructions, in this regard, were calculated to mislead the jury, and that they should not have been given, though we are not prepared to hold that the case should be reversed because they were given.

Other objections are made to the fourth, ninth and twelfth instructions, but we think they are not tenable.

The fifteenth and sixteenth instructions, we think, were calculated to mislead the jury, and should not have been given, even if good in the abstract as propositions of law.  They are calculated to impress the jury with the idea that the defense of the appellee was complete unless the plaintiff should prove the insanity of Andersen by a preponderance of the evidence, whereas we have seen that although insanity may be clearly proven, in order to fix liability on appellee the insanity must be such that the insane person did not know that the suicidal act he was about to commit would cause death or endanger life.  The writer thinks, under the issues made, these instructions were calculated to mislead the jury to the prejudice of appellant, but the majority of the court are of opinion that the burden of

proof in this regard, it being shown that Andersen died by his own hand, was on appellant, and therefore the instructions were calculated to prejudice appellee.

On the motion for new trial appellant produced and read the affidavits of William B. Babcock and Louis Bastrup, one of appellant's attorneys, which show that said Babcock was called as a witness by appellee on the trial to identify the application upon which the policy sued on was issued; that his statement made on the trial that the application offered in evidence was the only one received by appellee, and the one on which said policy was issued, *was a mistake;* that at the time he made this answer he had wholly overlooked and forgotten the fact that the policy which was issued on said application offered in evidence, was the policy called a "Free Tontine Policy," which is materially different from the policy in suit, and which is called a "Tontine Installment Policy;" that he clearly and distinctly recollects that the policy issued on said application was not the "Tontine Installment Policy" sued upon, but was a "Free Tontine Policy," specifying that the amount insured named in it was $6,000, payable in one lump sum to Andersen, his executors, etc., and that these facts appear on the books of appellee; that Andersen held said "Free Tontine Policy" until about October 20, 1894, when he, Babcock, at the request of Andersen, returned it to the home office of appellee at New York, for the purpose of surrendering it; that he, Babcock, wrote a letter to said home office of appellee, which accompanied said "Free Tontine Policy," and requested appellee to issue to said Andersen a "Tontine Installment Policy," such as the one sued on, and that no formal application was made to appellee for the "Tontine Installment Policy;" that he received said "Tontine Installment Policy" on November 9, 1894, and that it was for $9,455.40, payable in thirty equal

annual installments, and was numbered the same as said "Free Tontine Policy" which had been surrendered and cancelled; that he delivered said "Tontine Installment Policy" to Andersen, and sometime after it was returned to him, said Babcock, by Andersen, for the purpose of changing the time and mode of premium payments from annual to semi-annual. Said affidavits further show facts which (without enumerating the same) establish that these matters were first known to appellant and his attorney after the trial of said cause, and tend strongly to show that appellant and his attorney were not negligent in failing to discover the same.

That this evidence is material to the issue, and is liable to change the result on another trial, seems clear. The defense of appellee is based on the "sane or insane clause" contained *in said application*—not in the policy *proper*. It is a pertinent inquiry, therefore, whether, as between appellee and said Andersen, the policy sued on was intended to be issued on the same application on which the original "Free Tontine Policy," which was surrendered and cancelled, was issued. If the policy sued on was issued without any formal application, and it should appear that it was not the intention of Andersen and appellee that it should issue on the application on which the original policy issued, then the defense of suicide by appellee can not be made, and this would be decisive of the case in appellant's favor.

The same question was before the Supreme Court of Minnesota in the case of Scheffer v. Nat'l Life Ins. Co., 25 Minn. 538, in which that court said: "But it is claimed that the application introduced, and in which the false representation is contained, was not sufficiently identified as the one upon which the policy issued, and the one to which it refers. The facts presented by the record are, that on Nov. 23, 1868, the company issued

a policy upon the life of Charles Scheffer, payable to Kate Scheffer, his wife. This policy was for $5,000, and was issued upon an application dated Nov. 19, 1868, signed 'Kate Scheffer per Charles Scheffer and Charles Scheffer.' In 1871, Kate Scheffer died, and on November 16th of that year Charles Scheffer applied to the company by letter, stating the fact of his wife's death, and requesting the company to issue a new policy, payable to himself and heirs. In compliance with this letter, the policy in suit was issued for the same amount and of the same date as the former policy. It does not appear whether, aside from the date, amount name and of the payee, the two policies were or were not alike. That the company understood the last policy to be issued upon the application of Charles and Kate Scheffer, upon which the first policy issued, was proved clearly enough. If Charles Scheffer so understood it, then the defense was made out. There is nothing to show that he so understood it, except the reference in the policy to an application for it, and on the faith of which, as recited in the policy, it issued. His letter of November 16, 1871, was an application for that policy. It was competent for the parties to agree upon or treat the application of November 19, 1868, as the basis of the last policy, and as the application on which it issued. But we can not say that the reference in the policy to an application, on the faith of which it is issued, was to the application of Charles and Kate Scheffer, of November 16, 1868, rather than to the application of Charles Scheffer by his letter of November 16, 1871. It was competent for the company to show that both parties understood the reference to be to the first of these applications, or to both. But in the absence of any proof, other than the reference itself, that Scheffer so understood it, we can not say that the jury were not justified in concluding that

he understood the reference to be to the application by his letter of November 16, 1871.

"And this is especially so in view of the fact that the first policy was not introduced in evidence, and it does not appear that there was any condition in it making its validity depend on the truth of the representations in the application on which it issued. Had there been such a condition, the inference would be strong that the second policy was understood to depend upon the same condition. But there can be no such inference where the conditions of the first policy are not known."

See, also, Parker v. Amazon Ins. Co., 34 Wis. 369.

In the case at bar the first policy was not offered in evidence, and none of its conditions are shown.

On the motion for a new trial the court heard counter affidavits. This should not have been done. Mendell v. Kimball, 85 Ill. 582; Rybolt v. Milliken, 5 Ill. App. 494; Protection Life Ins. Co. v. Dill, 91 Ill. 178; City of Chicago v. Edson, 43 Ill. App. 420; Wray v. People, 70 Ill. 664; Kalkaska, etc., Co. v. Thomas, 17 Ill. App. 235.

We are of opinion the Circuit Court should have granted a new trial because of this newly discovered evidence.

For the errors in instruction 14 1-2, and refusing appellant a new trial, the judgment is reversed and the cause remanded.