NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1043
_____

GIANFRANCO ARENA,
                    Appellant

v.

RIVERSOURCE LIFE INSURANCE CO.
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-16-cv-05063)
District Judge:  Hon. Jose L. Linares
_____

Submitted Under Third Circuit LAR 34.1(a)
September 10, 2019

Before:  CHAGARES, JORDAN, and RESTREPO, *Circuit Judges.*

(Filed: September 18, 2019)
_____

OPINION*
_____

------

  * This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Gianfranco Arena ("Arena") brought an action for breach of contract against RiverSource Life Insurance Co. ("RiverSource") after it denied his claim for the benefits from the life insurance policies on his wife, Christine Arena ("Christine"). The United States District Court for the District of New Jersey concluded RiverSource was entitled to deny Arena's claim because his wife's death was subject to the suicide exclusion clauses in her insurance policies. We will affirm.

## I.    BACKGROUND

In 2014, Christine purchased two life insurance policies issued by RiverSource; one was a term policy and the other a "Flexible Premium Adjustable" policy. (App. at 176-77.) Both policies contain "[s]uicide [e]xclusion" clauses which limit RiverSource's liability for a death by suicide. (App. at 177.) The term policy provides that: "If the insured, whether sane or insane, dies by suicide within 2 years from the Policy Date, Our liability is limited to an amount equal to the total premiums paid." (App. at 177 (emphasis removed).) The Flexible Premiums Adjustable policy says that: "Suicide by the Insured, whether sane or insane, within two years from the Policy Date is not covered by this policy. In this event the only amount payable by Us to the beneficiary will be the premiums which You have paid, minus any Indebtedness and partial surrenders." (App. at 177 (emphasis removed).)

By all accounts, Christine had a fulfilling and successful life. She thrived professionally, working as an in-house attorney for Time Warner. She had a caring husband and four healthy children. She was active in the Roman Catholic church and in

2

her community, including service as the president of a charitable foundation. But, by 2015, the Arenas faced some financial stress. The IRS determined they owed $60,000 in back taxes, and, the sale of their existing home fell through, after they had already purchased a new one.

Four days after that sale fell through, in the early morning of April 1, Arena found his wife sitting at the kitchen table, talking on the phone to their parish priest. Arena discovered she had already gone to the parish's rectory earlier that morning to speak to the priest in person. Christine was troubled, and the Arenas decided to promptly schedule an appointment for her to see a psychiatrist, Dr. Lester Noah Shaw.

At that appointment, Dr. Shaw found that Christine did not fit the criteria for clinical depression because she only had experienced symptoms of anxiety and depression for four to five days. Dr. Shaw also determined that Christine had a low risk of suicide, as "there were a lot of protective factors and almost no risk factors." (App. at 432.) Nonetheless, he prescribed for her Clonazepam and Sertraline, the generic versions of Klonopin and Zoloft.[1] Christine began taking the medications immediately, but her condition continued to deteriorate. On April 4, Dr. Shaw increased her dose of Clonazepam, and two days after seeing her again, he again increased her dose. Following

---

[1] Those medications have the potential for serious side effects, including depression and suicidal thoughts and behaviors. The FDA warns that patients taking Klonopin should be monitored for "the emergence of new or worsening depression, suicidal thoughts or behavior, and/or any unusual changes in behavior." (App. at 433.) There are also concerns that Zoloft may lead to symptoms including anxiety and impulsivity, and "that such symptoms may represent precursors to emerging suicidality." (App. at 433 (citation omitted).)

two more appointments, Dr. Shaw increased Christine's dose of both medications. On April 13, Christine returned to Dr. Shaw and he added a prescription for Trazodone, another antidepressant.

On April 21, tragedy struck. The day started off normally. Christine worked from home. At 2:00 p.m., she emailed the other board members of the charitable foundation she led. At 2:06 p.m., she called her office and spoke to her boss. At approximately 2:30 p.m., Christine's mother went to pick up the children from school. During the time Christine's mother was out, Arena and Christine had two brief telephone conversations, at 2:48 p.m. and 2:52 p.m., and Christine called him again at 3:07 p.m. At some point before her mother returned home, Christine took two of her husband's leather belts, moved a chair from another bedroom into a bathroom, fastened the belts together and arranged them so that, having wrapped one around her neck, she was able to step off the chair and hang herself.

When her children arrived home from school, Christine's eleven-year-old daughter discovered her mother, who was still alive. Christine's mother called 911 at 3:11 p.m., and Christine was rushed to the hospital. Christine passed away nine days later. The police report listed the incident as a "suicide attempt[,]" and the medical examiner listed Christine's manner of death as a "suicide[,]" though neither made an inquiry into Christine's state of mind. (App. at 440.)

Arena filed a claim for life insurance benefits with RiverSource. The insurance company denied coverage, citing Christine's death certificate and the suicide exclusion clauses in her policies. Arena asked RiverSource to reconsider its decision, on the basis

4

that Christine's death was a result of the medications she had been prescribed, but RiverSource reaffirmed its decision to deny coverage. He then filed a breach of contract action in the Superior Court of New Jersey, which RiverSource removed to the District Court.

RiverSource eventually moved for summary judgment. That motion was granted, despite a report by a forensic expert, Dr. Glenmullen, who opined that Christine could have suffered a medication-induced disorder that altered her state of consciousness to the point that she was unable to understand the consequences of her actions or form suicidal intent. The District Court reasoned that "the Suicide Exclusions would apply to this case even if Mrs. Arena would not have committed suicide but for the effect that the medications had on her state of mind." (App. at 9.) It acknowledged that our precedent, *Johnson v. Metropolitan Life Insurance Co.*, 404 F.2d 1202 (3d Cir. 1968), established that killing oneself does not always qualify as suicide and that intent is required. But, the Court concluded that the inquiry is into whether the decedent lacked "awareness that his or her actions would result in death" and that Christine had such awareness. (App. at 10-11.) It determined that Arena "ha[d] not offered any contentions or allegations 'which could support a reasonable conclusion that the decedent was unaware of the fatal consequences of [her] acts[]'" and that Dr. Glenmullen's opinion was insufficient to create a genuine dispute of fact. (App. at 11 (second alteration in original).) The Court further reasoned that, even if such evidence existed, the fact that Christine was "suffering from an irresistible impulse to commit self-harm 'would affirmatively establish that self

5

destruction was the very result intended, albeit by a deranged mind.'" (App. at 11

(quoting *Johnson*, 404 F.2d at 1204).)

Arena timely appealed.

## II. DISCUSSION[2]

On appeal, Arena argues the District Court erred in two ways.[3] First, he says that

a suicide exclusion clause requires the deceased to intend to take her life and that

Christine did not have that intent, and, second, that the Court improperly shifted the

burden from RiverSource to prove Christine had such intent to Arena to prove that she

did not.

The parties' dispute thus centers primarily on what intent on a decedent's part is

required for a death to be a suicide under *Johnson* and New Jersey law. Arena contends

that "suicide requires intent to end one's life[]" and that intentional actions and even

"'awareness' that one's actions will result in death[]" are insufficient. (Opening Br. at 2.)

RiverSource disagrees and contends that awareness that one's acts will result in death is

enough.

It is true, as Arena argues, that it is longstanding precedent that a suicide clause,

excluding coverage for sane or insane actions, will only apply if the decedent intended to

---

[2] The District Court had jurisdiction under 28 U.S.C. §§ 1332 and 1441. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review *de novo* the grant of summary judgment. *Dwyer v. Cappell*, 762 F.3d 275, 279 (3d Cir. 2014).

[3] Because we agree with Arena and conclude that intent is a required element for suicide under New Jersey law, we do not address Arena's argument that if a lower standard of awareness fulfills that requirement, a genuine material dispute of fact still exists.

6

cause her death.  *See Bigelow v. Berkshire Life Ins. Co.*, 93 U.S. 284, 287 (1876)

(concluding that such a clause will apply "if the insured was conscious of the physical

nature of his act, and intended by it to cause his death, although, at the time, he was

incapable of judging between right and wrong, and of understanding the moral

consequences of what he was doing").  Our decision in *Johnson* comports with that

understanding and held that New Jersey law requires, at least under an interpretation most

favorable to the insured, that the "self destruction purposefully [be] accomplished *in

accordance with an intention* or design[.]"  *Johnson*, 404 F.2d at 1204 (emphasis added).

In *Johnson*, we also specifically referred to two situations in which the deceased would

not have the required intent to commit suicide.  The first is a circumstance in which a

purposeful act is undertaken but the result is not intended.  *See id.* ("[A] deranged person

can believe that he is immortal, or that fuel oil is water, or, on some other irrational basis,

that saturating his clothes with fuel oil and applying a lighted match will not kill him.").

The second is when a person's "mental disorder [is] … so extreme that he has no

comprehension whatever of what he is doing."  *Id.*  Subsequent New Jersey decisions

have since confirmed that suicide requires an intent to achieve the result of death.  *See,

e.g.*, *Biro v. Prudential Ins. Co. of Am.*, 265 A.2d 830, 838 (N.J. Super. Ct. App. Div.

1970) (Matthews J., dissenting) ("Suicide includes both the notion of the instrumentality

of death being the decedent … and the notion that the decedent intended to take his own

life."), *adopted by Biro v. Prudential Ins. Co. of Am.*, 271 A.2d 1 (N.J. 1970) (per

curiam).  We therefore conclude that New Jersey law requires, as an element of suicide,

that the decedent had an intent to end her life.

7

But such intent can be inferred from a decedent taking actions that will result in death. *Cf. Johnson*, 404 F.2d at 1204 (noting that nothing in the record suggested that the decedent's "acts, obviously well adapted to self destruction, were not so intended"). Circumstantial evidence is often the only evidence for suicide and is frequently used to establish intent. *See, e.g.*, *New York Life Ins. Co. v. Prejean*, 149 F.2d 114, 116 (5th Cir. 1945) (concluding that circumstantial evidence is sufficient if it is "consistent with the … theory of suicide" and "fairly and reasonably exclude[s] every other reasonable explanation of the facts"); *cf. Hudek v. St. Peter Greek Catholic Cemetery Ass'n*, 138 A. 654, 655 (N.J. Ch. 1927) (concluding that "indirect or circumstantial evidence" was insufficient because it "consists merely of a repetition of vague rumors made by the alleged suicide, shortly before his death, or mere conjectures and conclusions of the witnesses"), *aff'd*, 140 A. 920 (N.J. 1928). But "summary judgment [i]s improper … if the record establishe[s] a disputable issue of fact whether the insured … was attempting to take his life[.]" *Johnson*, 404 F.2d at 1204. Arena contends that, under that standard, RiverSource's "evidence is insufficient because RiverSource bears the burden of showing that Christine died with the intent to end her own life, and merely pointing to facts confirming that she died at her own hands does not satisfy its burden." (Opening Br. at 38.)

We disagree. The parties do not dispute that Christine took two of her husband's leather belts, moved a chair from another bedroom into a bathroom, fastened the belts together and wrapped one around her neck, and arranged the belts in a manner to effect a hanging. Nor do they dispute that she in fact stepped off the chair and hanged herself.

8

Those actions are sufficient circumstantial evidence to establish not only that Christine had "awareness" that those actions would end her life but also that she intended to do so. While such intent may have arisen suddenly on an otherwise relatively normal morning, taking those actions is strong circumstantial evidence that at the time she took her own life, she intended that result. As RiverSource notes, "there could have been no other outcome from Ms. Arena's action other than death." (Answering Br. at 30.) RiverSource was not required to produce direct evidence in the form of a suicide note or contemporaneous expression of her intentions. *Cf. Johnson*, 404 F.2d at 1204 (relying on a decedent's actions to establish intent).

Thus, to avoid summary judgment, Arena had to put forward evidence to create a genuine dispute regarding Christine's intent to commit suicide. He contends that Christine's mental state falls under the second "no intent" situation in *Johnson*, that Christine's mental disorder was "so extreme that [s]he ha[d] no comprehension whatever of what [s]he [wa]s doing." 404 F.2d at 1204. He bases that claim on three sources of evidence. First is "testimony from Christine's family, friends and colleagues, all of whom testified that she would never have intended to end her own life had she been thinking clearly." (Opening Br. at 3.) Second is testimony from her physicians, including Dr. Nash, who testified that Christine "was not capable of understanding the consequences" of hanging herself. (App. at 512.) Third is Dr. Glenmullen's forensic diagnosis of Christine, which concluded to "a reasonable degree of medical certainty that Christine suffered from medication-induced suicidality—a disorder that may cause a person to commit self-harm without intending or understanding the consequences of his

9

or her actions." (Opening Br. at 3.) The drugs Christine was prescribed are known to lead to suicidal thoughts and behaviors, and Dr. Glenmullen "testified that '[d]rug-induced impulsivity can easily include . . . methodical behavior and that's what … retrieving the belts was[.]'" (Opening Br. at 39 (alterations in original) (quoting App. at 438).)

We do not discount the importance of those alleged facts for the family, but they are not legally material. They fall into two categories. There is, first, evidence as to Christine's general mental state being inconsistent with suicide, as well as her moral aversion to suicide. That evidence is not enough because it does not undermine the undisputed facts showing deliberate acts which can only be explained as an effort to kill herself, even if she was not thinking clearly or was insane, when she acted. Second, there is the evidence from Dr. Glenmullen that Christine was acting impulsively under the control of her medication and that, as a result, the medications obfuscated her ability to form the requisite intent – in short, that the drugs compelled Christine to take the actions she did and so the actions are not probative of her mental state. But acting on an irresistible impulse is different than having no intent or no comprehension of the actions one is taking. We rejected a similar irresistible impulse argument in *Johnson* and noted that such an impulse "would affirmatively establish that self destruction was the very result intended, albeit by a deranged mind." *Johnson*, 404 F.2d at 1204. While in *Johnson* the impulse originated from his own mind and not from an outside influence, the result is no different because the relevant inquiry is the mental state of the person at the

time of the actions, and not what led to that mental state. The presence of medications does not mean such deaths cannot qualify as suicides.[4]

Arena's second argument is also unpersuasive. He contends that "[t]he district court impermissibly placed the burden on [him] to show that the suicide exclusions did not apply when New Jersey law requires insurers to establish that all coverage exclusions apply." (Opening Br. at 2.) True enough, in actions for insurance benefits, the insurance company bears the burden of proving that an exclusion to coverage applies. *Aviation Charters v. Avemco Ins. Co.*, 763 A.2d 312, 314 (N.J. Super. Ct. App. Div. 2000). But here the District Court concluded, as do we, that RiverSource met that burden of proof. *Cf. Nat'l State Bank v. Fed. Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992) ("The Third Circuit has stated that 'where the movant bears the burden of proof at trial and the

---

[4] We do not believe that *Kahle v. Plachman*, 428 A.2d 913 (N.J. 1981), supports the proposition that the Supreme Court of New Jersey has endorsed the idea that a decedent who was prescribed psychotropic medication was incapable of forming the required intent for purposes of a suicide exclusion clause. In *Kahle*, the court held that the actions of the decedent, who took such drugs, were "committed under circumstances in which the decedent was devoid of normal judgment [and thus could] not [be] considered to be willfully, *purposefully or intentionally* self-inflicted[.]" *Id.* at 916. That case, however, arose in the context of the Worker's Compensation Act where "[t]he issue of the compensability of an employee suicide … turns not on the employee's conscious volition or knowledge of the consequences of his act, but rather on the existence of an unbroken chain of causation from the work-connected injury to the suicide." *Id.* There, the decedent's mental state stemmed from her injury at work, regardless of her state of mind when she took her own life. *Id.* at 913-14. Moreover, claims of medication for depression obfuscating a decedent's intent to harm herself have in the past been rejected as a basis for not enforcing a suicide exclusion in other Courts of Appeals. *Charney v. Ill. Mut. Life Cas. Co.*, 764 F.2d 1441, 1442-43 (11th Cir. 1985) (per curiam).

11

motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented.'" (quoting *Resolution Tr. Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992))). After that, it was up to Arena to produce evidentiary materials demonstrating the existence of a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003). He failed to do so. None of this, of course, lessens the tragedy that he and his family have suffered. Nevertheless, the summary judgment ruling was sound.

## III.   CONCLUSION

For the foregoing reasons, we will affirm the judgment of the District Court.