KNIGHTS TEMPLARS' & MASONS' LIFE INDEMNITY CO. v. JARMAN.

(Circuit Court of Appeals, Eighth Circuit. October 15, 1900.)

No. 1,347.

1. LIFE INSURANCE—DEFENSE OF SUICIDE—MISSOURI STATUTE.

Rev. St. Mo. 1889, § 5855, which provides that, in suits on policies of life insurance issued by any company doing business in the state, it shall be no defense that the insured committed suicide, unless it is shown that he contemplated suicide at the time he made application for such policy, and that "any stipulation in a life insurance policy to the contrary shall be void," was applicable, as has been judicially determined, to policies or certificates of assessment companies issued and delivered in that state to a citizen thereof prior to the taking effect of Act March 30, 1887, for the regulation of assessment companies (Rev. St. 1889, §§ 5860–5872). This act applied to foreign assessment companies doing business in the state, and contained a proviso that nothing contained therein should subject companies doing business thereunder to the provisions or requirements of the general insurance laws of the state, except as distinctly therein set forth. *Held* that, conceding that under said act the provisions of section 5855 did not apply to certificates of assessment companies thereafter issued, yet, as to a certificate previously issued, said section was a part of the contract, and by its terms rendered void a provision therein exempting the company from liability in case of the death of the insured by suicide, and that the subsequent act of March 30, 1887, could not be construed as bringing such provision into effect, since, if given such effect, it would be unconstitutional, as impairing the obligation of the contract made by the parties, and in consideration of which the insured had paid his assessments.

2. SAME—CONSTRUCTION OF STATUTE.

In Rev. St. Mo. 1889, § 5855, which excludes a defense to an action on a life insurance policy on the ground that the insured committed suicide,

the words "committed suicide" are used in their popular sense as comprehending all cases where the insured took his own life, whether while sane or insane. Sanborn, Circuit Judge, dissenting.

3. SAME—AMENDMENT OF CONSTITUTION OF COMPANY—RETROSPECTIVE EFFECT.
    The legislative acts of a private corporation, like those of a public body, are presumed to be intended to operate prospectively only; and amendments to its constitution adopted by an assessment insurance corporation, which, if given a retrospective operation, would change the contracts made by its outstanding certificates or policies by reducing the amounts payable thereunder by their plain terms, will be construed as intended to affect only policies subsequently issued, unless there are imperative reasons which forbid such construction.

4. SAME—ASSENT OF POLICY HOLDER TO FUTURE AMENDMENTS.
    A clause in an application for a policy of life insurance in a mutual assessment company, that the applicant agrees, if accepted, "to abide by the constitution, rules, and regulations of the company, as they now are, or may be constitutionally changed hereafter," cannot be reasonably construed as giving his assent in advance to any change which the company may see fit to make in its constitution or laws in the future which materially lessens the value of his policy, by reducing the amount of indemnity which by its terms the company promised to pay; nor will it have the effect of rendering such action binding upon him or the beneficiary in his policy.
    Sanborn, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Western District of Missouri.

H. B. Hicks and Samuel P. Huston, for plaintiff in error.

F. H. Bacon (E. M. Harber and A. G. Knight, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge. This action is founded on a certificate of membership issued by the Knights Templars' & Masons' Life Indemnity Company, the plaintiff in error, to John P. Jarman, by the terms of which a certain sum of money, hereafter mentioned, was payable to Rosa B. Jarman, the wife of John P. Jarman, on the death of the latter. The plaintiff in error will be hereafter designated as the "defendant" or the "defendant company." The certificate was issued and delivered on October 25, 1885. When it was issued the constitution or by-laws of the defendant company, which were indorsed on the back of the certificate, provided "that a policy of membership for $5,000 shall be good for all money in the death fund arising from one assessment, provided it shall not exceed $5,000, and all the money paid on the policy in assessments"; and Jarman's certificate declared on its face that the defendant company would pay "to Rosa B. Jarman, wife, the children or heirs of said member, and in the order named, * * * the sum of five thousand dollars, and all the money paid on the policy in assessments, subject to the limitation as to the amount of such payment as is provided in section one (1) of article seven (7) of the constitution, on the back of this policy." By an amendment to the constitution or by-laws which was adopted on January 8, 1889, the company limited its liability to refund all assessments that might have been paid to such as were paid "for the first five years" of membership; and by later

amendments, which were made, respectively, on February 20, 1894, and January 14, 1896, it exempted itself from liability to refund any assessments, or to pay any greater sum than the principal sum specified on the face of its certificates. The certificate of membership, when issued, contained a provision that the policy should become null and void "in case of the self-destruction of the holder of this policy, whether voluntary or involuntary, sane or insane"; and it was stipulated that John P. Jarman, the deceased member, committed suicide on September 12, 1898, "while insane to such an extent as to be incapable of understanding the nature or consequences of his act, * * * by a gunshot wound inflicted by himself." When sued upon its policy, the defendant company interposed two defenses: First, it asserted that it was not liable on its policy for any amount, because Jarman took his own life; second, it contended that even if it was liable for the face of its policy, to wit, for the sum of $5,000, it was not liable for the amount of assessments which the deceased member had paid, and which it had originally agreed to refund, because of the aforesaid amendments made to its constitution on February 20, 1894, and January 14, 1896. Both of these contentions were overruled by the trial court (95 Fed. 70), and the case is now before this court for review.

In the case of Indemnity Co. v. Berry, 4 U. S. App. 353, 1 C. C. A. 561, 50 Fed. 511, it was held by this court, affirming the decision of Judge Caldwell on the circuit (Berry v. Indemnity Co., 46 Fed. 439), that a certificate or policy of insurance which was executed by the defendant company and delivered in the state of Missouri to a citizen of that state prior to 1887, and was in the same form, substantially, as the policy now under consideration, was a Missouri contract, and a policy of insurance, and that, being such, it was subject to the provisions of section 5855 of the Revised Statutes of Missouri of 1889, which declares, in substance, that, in suits on policies of insurance on life issued by any company doing business in the state of Missouri, it shall be no defense that the insured committed suicide, unless it is shown to the satisfaction of the court or jury trying the case that the insured contemplated committing suicide at the time he made his application for the policy, and that any stipulation in a life insurance policy to the contrary shall be void. The correctness of that view is not challenged on the present occasion, and as the policy in suit was issued to a citizen of Missouri, and delivered to him in that state, and the initial assessment there paid, it follows that when the policy was delivered it covered the risk of suicide, by virtue of the local statute. On March 30, 1887, nearly two years after the policy in suit was issued, the legislature of the state of Missouri enacted a law with reference to insurance companies doing business on the assessment plan, which now appears in the Revised Statutes of that state for the year 1889, as article 3, c. 89 (being sections 5860 to 5872, both inclusive). This act placed foreign insurance companies doing business in the state on the assessment plan under the supervision of the insurance department of the state, and one section thereof (being section 5869) subjected such foreign assessment companies to all the provisions of section

5912 of the Revised Statutes of Missouri for 1889, which was then in force, but concluded with the following proviso:

"Provided, always, that nothing herein contained shall subject any corporation doing business under this article to any other provisions or requirements of the general insurance laws of this state, except as distinctly herein set forth."

Section 5912, to which reference was thus made, related wholly to the mode of obtaining service on foreign insurance companies doing business within the state of Missouri; and it is accordingly claimed that the operation of the proviso was to relieve insurance companies doing business on the assessment plan, as distinguished from companies doing business in other ways, from the disability imposed by section 5855, to plead suicide as a defense, inasmuch as section 5855 forms a part of the general insurance laws of the state, and was not incorporated into the act of March 30, 1887, relating to assessment companies. It is by no means certain that the proviso in question was intended by the lawmaker to except assessment companies from the operation of section 5855. The legislature did not see fit to repeal that section, but left it standing and in full force as a part of the statute law of the state,—at least, in so far as it affected ordinary life companies; and it is difficult to assign any reason for prohibiting companies of the latter kind from pleading the defense of suicide which does not apply with equal force to assessment companies. It has been held, however, in Haynie v. Indemnity Co., 139 Mo. 416, 41 S. W. 461, that from the date of its adoption the proviso did exempt assessment companies from the operation of section 5855, and enable them to plead suicide as a defense to policies thereafter issued which by their terms excluded the risk of death by suicide. Accepting that as an interpretation of a local law by the highest court of the state, which this court is required to adopt. we pass to the inquiry whether it was competent for the legislature, by the proviso in the act of March 30, 1887, to relieve the defendant company from the operation of section 5855, as respects policies theretofore issued and then outstanding, which were clearly subject to its provisions when they were issued. In considering this question, it must be borne in mind that section 5855 not only provides that, in suits on life insurance policies issued by companies doing business in the state of Missouri, it shall be no defense that the insured committed suicide, but also declares that "any stipulation in the policy to the contrary shall be void." The effect of this statute upon the policy in controversy was to expunge the provision which is found therein, in substance, that it should become null and void if Jarman took his own life, either sane or insane. The contract, by force of the statute, took effect as it would have done if no such clause as that last referred to had been inserted, and embraced the risk of death by suicide as well as from other causes. Moreover, in legal contemplation, the first and all subsequent premiums or assessments were paid by the insured in consideration of the assumption by the insurer of the risk of death by suicide. as well as from other causes, since the statute rendered the agreement to the contrary utterly meaningless and nugatory. In

this way the statute was worked into the contract, and became a part of it, and determined its meaning, scope, and effect. In the light of the statute, the parties must be presumed to have agreed that the insurer would assume the risk of death by suicide, because the law would not permit them to agree otherwise. We are of opinion, therefore, that it was not within the power of the legislature to declare in 1887, with respect to the policy in suit, and others of a like character, that self-destruction might be pleaded as a defense, which was tantamount to saying that the policy should not comprehend the risk of death by suicide, because a legislative enactment to that effect would impair the obligation evidenced by the policy, contrary to the mandate of the federal and the state constitutions. Const. Mo. § 15, art. 2; Rev. St. Mo. 1889, p. 59. In so holding we have not overlooked the decision in Ewell v. Daggs, 108 U. S. 143, 2 Sup. Ct. 408, 27 L. Ed. 682, upon which much reliance is placed by the defendant company, but we are of the opinion that the doctrine of that case is not applicable to the one at bar. In Ewell v. Daggs a purely statutory defense, existing under the usury laws of a state, when a certain contract for the loan of money was entered into, was taken away by a subsequent constitutional amendment; and it was held, in substance, that such repeal did not impair the obligation of the contract. The court in that case regarded the usury law that had been repealed as in the nature of a penal statute inflicting a penalty upon the lender, which any subsequent legislature could repeal, and thereby remit the penalty. It also said, in substance, that the borrower in such case had no right to complain of the remission of the penalty, because it was not imposed for his benefit, but rather for the benefit of the public, and, furthermore, that the usury statute conferred a privilege which belonged to the remedy, and formed no element in the rights that inhered in the contract. This reasoning, we think, is entirely inapplicable to the case in hand, because, as we have heretofore shown, the Missouri statute (section 5855) operated to enlarge the scope of the policy, and make it comprehend risks that but for the statute would not have been within its provisions.

While on this branch of the case another point will be noticed briefly, simply because it is insisted upon in the argument that was made in behalf of the defendant company. It is said that, by a long line of adjudications prior to the adoption of the Missouri statute excluding the defense of suicide, it had been determined that the words "committed suicide," as used in insurance policies, meant "a voluntary act when a person was in the possession of his ordinary reasoning faculties"; that the words "committed suicide" are used in that sense in section 5855, and, being so used, that the statute is not broad enough to cover the present case, because it is stipulated that Jarman took his own life "while insane to such an extent as to be incapable of understanding the nature or consequences of his act." A proper degree of respect for the legislature requires us to overrule this contention, since it is not probable that any legislative body in its right mind would declare that insurance companies shall not be allowed to make the defense of suicide if the insured

takes his life when in the full possession of all his reasoning facul-
ties, but may make it whenever it is claimed that he took his life
while insane. In view of the many long and embarrassing trials that
had taken place in actions upon insurance policies to determine the
mental state of the deceased at the time he took his own life, and
the difficulty in many cases of determining that issue with any ap-
proach to accuracy, it was deemed best to exclude the defense of sui-
cide altogether in such actions. The statute was doubtless prompted
by that view, and, whether it be regarded as wise or unwise, it was
competent for the legislature to enact it; and we have no doubt that
the words "committed suicide" were used in a popular sense, to com-
prehend the act of self-destruction, without reference to the mental
state of the actor.

We have next to determine whether the amendments to the de-
fendant's constitution of date January 8, 1889, February 20, 1894,
and January 14, 1896, whereby it expunged those provisions of its
constitution which obligated it, on the death of a member, to refund
"all money paid on the policy in assessments," have the effect of
depriving the plaintiff of the right to recover the assessments paid
on the policy in controversy, and of limiting her right of recovery
to the principal sum therein mentioned. The argument in favor of
giving the amendments such effect as is last described is based
wholly on the concluding paragraph of Jarman's application for the
policy, which is as follows:

"I further agree, if accepted, to abide by the constitution, rules, and reg-
ulations of the company as they now are, or may be constitutionally changed
hereafter."

Conceding, in accordance with the stipulation of the parties, that
the amendments in question were adopted legally in the manner
prescribed by the defendant's constitution and by-laws, we observe
in the first instance that there is nothing to indicate that the amend-
ments were intended to have a retrospective operation, and reduce
the amount payable on certificates or policies like the one at bar,
which was then outstanding, and, in plain language, obligated the
company to refund all assessments that might be paid thereon. The
present record contains no evidence which shows affirmatively that
the amendments were intended to operate retrospectively and extin-
guish the obligation to refund assessments that had been expressly
assumed, while the fact that outstanding policies were not recalled,
and the promise to refund assessments expunged or erased from
the face of such policies, fairly indicates, we think, that the amend-
ments were designed to operate prospectively on policies thereafter
executed. Aside from this view of the case, it is a well-established
rule for the construction of statutes that they should be so inter-
preted as to give them a prospective operation only, unless it is
manifest that they were intended to operate retrospectively, and
no reason is perceived why the same rule of construction should not
apply to the legislative acts of a private corporation. If it assumes
to amend its constitution or by-laws, and the amendment is in such
form that, if given a retrospective effect, it will alter obligations
which the company has assumed by existing contracts, it should

be presumed, unless there are imperative reasons to the contrary, that it was not intended to have such effect, but was only intended to prescribe a rule of action for the future. Carnes v. Association (Iowa) 76 N. W. 683; Wist v. Grand Lodge, 22 Or. 271, 29 Pac. 610; End. Interp. St. § 273; Suth. St. Const. § 464. In the second place, we observe that it is not a reasonable interpretation of the clause above quoted from the application that the applicant intended to assent in advance to any changes in its constitution and by-laws which the company saw fit to make, even if they reduced the amount of indemnity which the company had promised to pay in the event of his death, and thereby lessened the value of his policy. He was to occupy a dual relation to the company—First, as one of its members; and, second, as any other individual having a contract with it. In the former relation he was willing to be bound by any lawful amendment to the company's constitution and by-laws that the members collectively saw fit to adopt, which concerned the government of the corporation or the mode of transacting its business, and did not impair any of the essential provisions of his contract. He probably foresaw that in course of time the company might find it expedient to make some changes in its method of corporate government, or in the mode of transacting its business, or in its rules of discipline; and he doubtless intended to assent to all amendments of the constitution and by-laws which were framed for that purpose, and would not deprive him of any substantial right or benefit secured by his policy. It is not reasonable, however, to suppose that he intended to agree in advance that the company might at any time reduce the promised indemnity to any sum which it found it convenient to pay. The liberal indemnity that was promised by the policy as first drawn may have been, and probably was, the inducing cause which led Jarman to become a member of the defendant company; and it would be unreasonable to infer that he intended to agree that, after he had paid assessments upon his policy for a period of years, the consideration that had induced him to pay the same might be withdrawn in whole or in part without his consent. The record contains no evidence that the deceased member voted for any of the amendments now in question, or was aware of their adoption during his lifetime. And, even if it did appear that he voted for the amendments and was aware of their adoption, the presumption would be that he did so in the belief that the amendments operated prospectively, and not retrospectively upon antecedent contracts. All contracts, notwithstanding the general words or phrases which they may contain, should receive an interpretation which will accord with the presumed intention of the contracting parties, and will not work an injustice or lead to absurd consequences. U. S. v. Kirby, 7 Wall. 482, 19 L. Ed. 278; Church of Holy Trinity v. U. S., 143 U. S. 457, 461, 12 Sup. Ct. 511, 36 L. Ed. 226; Insurance Co. v. Kearney, 36 C. C. A. 265, 94 Fed. 314. Applying that rule of interpretation, we are unable to give to the clause found in Jarman's application a construction that would enable the defendant company, by a simple amendment to its constitution or by-laws, to repudiate a stipulation contained in the policy, which, in

the estimation of the policy holder, most likely gave to it its chief value.

The views which we have expressed are in accordance with the conclusion heretofore reached by several other courts, including the trial court, with respect to the same or kindred questions. Hale v. Union, 168 Pa. St. 377, 31 Atl. 1066; Wist v. Grand Lodge, 22 Or. 271, 29 Pac. 610; Weiler v. Union, 92 Hun, 277, 36 N. Y. Supp. 734; Grand Lodge v. Sater, 44 Mo. App. 445, 452, 453; Voigt v. Kersten, 164 Ill. 314, 45 N. E. 543; Startling v. Supreme Council, 108 Mich. 140, 66 N. W. 340; Smith v. Supreme Lodge, 83 Mo. App. —— (not yet reported), and cases there cited. The judgment below, awarding the plaintiff the full amount of the indemnity promised by the policy, is accordingly affirmed.

SANBORN, Circuit Judge (dissenting). Section 5855 of the Revised Statutes of Missouri of 1889 provides that "in all suits upon policies of insurance on life hereafter issued by any company doing business in this state it shall be no defense that the insured committed suicide unless" a state of facts not claimed to exist in this case conditioned the making of the application for insurance. The parties to this suit have stipulated that the insured, "while insane to such an extent as to be incapable of understanding the nature or consequences of his act, took his own life," and that, if section 5855 did "not operate against the defendant company as to this action, the defendant company is relieved from the payment of the policy aforesaid by the self-destruction of John P. Jarman," except to the extent of the repayment of his assessments, which amount to $811.83. Section 5855 prohibited the defense that the insured committed suicide, but it left all other legal and equitable defenses unaffected. Is the defense that the insured, "while insane to such an extent as to be incapable of understanding the nature or consequences of his act, took his own life," a defense that he committed suicide? If it is, it is prohibited by the statute. If it is not, the statute does not operate upon it, and under the express stipulation of the parties the amount of the plaintiff's recovery should be limited to $811.83. The statutes of the state of Missouri provide that "words and phrases shall be taken in their plain or ordinary and usual sense, but technical words and phrases, having a peculiar and appropriate meaning in law, shall be understood according to their technical import." Rev. St. Mo. 1889, § 6570. What is the plain, ordinary, and usual meaning of the words "committed suicide?" Does suicide here include, or does it exclude, the taking by a person of his own life while he is so insane that he is incapable of understanding the nature or consequences of his act? The definition of the word "suicide" in Webster's Dictionary reads in this way: "Suicide. The act of designedly destroying one's own life committed by a person of years of discretion and sound mind." In Worcester's Dictionary it is thus defined: "Suicide. The slayer or slaying of one's self; self-murder; a self-murderer." And the definition in the Century Dictionary is: "Suicide. The act of designedly destroying one's own life." The plain, ordinary, and usual sense of a word or phrase

cannot always be safely evolved from the inner consciousness of any one, and perhaps no better evidence of this meaning of the word "suicide" could be presented than the definitions of these standard and popular dictionaries. Not one of these definitions includes the act of one who is so insane that he is incapable of understanding the nature or consequences of the thing he is doing. In all of them the intent and design of the sound mind is an indispensable element. Under these interpretations a taking of one's life without the design of a sound mind is not suicide, and one who is so insane that he does not understand the nature or consequences of his act cannot be said to designedly or intentionally do that act. The plain or ordinary sense of the words "committed suicide," therefore, does not include the taking of his life by one who is so insane that he does not understand the nature or consequences of his act. Moreover, in the statute under consideration the words "committed suicide" were legal, technical terms, used to describe and define the basis of a defense to an action at law, and having an appropriate meaning in the law. It is a settled rule of construction that in interpreting the statutes of a state the federal courts follow the rules of construction enacted by its legislature or announced by its courts; and, if this rule is to be observed in the interpretation of section 5855, the words "committed suicide," in that section, must be understood according to their legal, technical import. In the year 1872 the supreme court of the United States declared, and the consensus of judicial opinion in England and America, while differing on other questions, always has been and is, that "suicide" or "death by one's own hand" (and the two terms are declared by the supreme court to be interchangeable. in Bigelow v. Insurance Co., 93 U. S. 284, 286, 23 L. Ed. 918), does not include or describe the taking of his life by one who is insane to such an extent that he does not understand the nature or consequences of his act. Insurance Co. v. Terry, 82 U. S. 580, 591, 21 L. Ed. 236; Insurance Co. v. Rodel, 95 U. S. 232, 24 L. Ed. 433; Scheffer v. Insurance Co., 25 Minn. 534, 537; Breasted v. Trust Co., 4 Hill, 73; Newton v. Insurance Co., 76 N. Y. 426; Eastabrook v. Insurance Co., 54 Me. 224; Phadenhauer v. Insurance Co., 7 Heisk. 567; Insurance Co. v. Isett's Adm'r, 74 Pa. St. 176; Insurance Co. v. Groom, 86 Pa. St. 92, 96; Merritt v. Insurance Co., 55 Ga. 103; Association v. Waller, 57 Ga. 533; Phillips v. Insurance Co., 26 La. Ann. 404; Cook, Life Ins. § 42. Many other authorities to like effect might be cited, and none have been found which hold that the taking of his life by one who is so insane that he is incapable of understanding the nature and consequences of his act is the commission of suicide. These decisions establish the proposition that the word "suicide," in its technical, legal meaning, does not include the taking of his life by one who is insane to the extent stipulated in this action. The result is that the words "committed suicide" do not, either in their plain, usual, ordinary sense, or in their technical, legal import, include or cover the taking of his life by one who is insane to such an extent that he is incapable of understanding the nature or consequences of his act. From these premises the logical conclusion is to my mind irresistible that the defense that, "while insane to such an extent as to be incapable of

understanding the nature or consequences of his act," the insured took his life, is not a defense that he committed suicide. For this reason section 5855 does not operate upon or affect this action, and under the stipulation of the parties the amount of the plaintiff's recovery should be limited to $811.83. The presumption of fact and of law is that the legislature of the state of Missouri, when it enacted this section we have been considering, knew the plain, ordinary sense of the words "committed suicide"; that they knew the technical, legal meaning which repeated judicial decisions had given to these words; and that they were familiar with the established rule of law and of the statute of their state,—that the words must be interpreted in accordance with this plain meaning and this technical import. The imputation to the members of this body of ignorance or of disregard of the meaning of these words and of this settled rule of construction is forbidden by a proper degree of respect for that legislative body. The defense of the company that the insured took his own life while insane should be sustained, and the recovery should be limited to the amount of the assessments which the insured paid to the company