# BROWN v. GRAND FOUNTAIN OF THE UNITED OR-
## DER OF TRUE REFORMERS.

STATUTES; FRATERNAL BENEFIT ASSOCIATIONS; LIFE INSURANCE; CON-
TRACTS.

1. Statutes will be given a propective operation only, unless the language
used clearly indicates that they were intended to be retrospective in
their operation,—especially where to give them a retrospective effect
will impair the obligation of a contract.

2. The amendment of the charter of a fraternal benefit association, origin-
ally a joint-stock company, depriving certificate holders of the right
formerly possessed, of designating their beneficiaries, will not affect
existing contracts of insurance, in the absence of anything in the
amended charter to show that it was intended to have a retrospective
effect, and where the existing certificate holders did nothing to show
an intention to acquiesce in such amendment.

No. 1664.   Submitted October 10, 1906.   Decided November 9, 1906.

HEARING on an appeal by one of the defendants to a bill of
interpleader from a decree of the Supreme Court of the Dis-
trict of Columbia, adjudging the other defendants to be entitled
to a fund in the possession of the complaint.      *Reversed.*

The COURT in the opinion stated the facts as follows:

Appeal from a decree of the supreme court of the District of
Columbia, adjudging the heirs at law and next of kin of Milly
Cook, deceased, to be entitled to the death benefits provided for
in two certificates issued to said decedent by the Grand Fountain
of the United Order of True Reformers.

It appears that the Grand Fountain of the United Order of True Reformers, which we shall in this opinion refer to as "the Grand Fountain," was incorporated as a joint-stock company on April 4, 1883, with an authorized capital stock of "not less than $100 nor more than $10,000, to be divided into shares of the value of $5 each." The purposes for which the Grand Fountain was incorporated, as set forth in the second paragraph of its charter, were as follows: "The purposes for which it is formed are to provide a place of burial for deceased members and to defray the expenses of their funerals; to assist in the support and education of their widows and orphans, and in this connection to provide what is to be known as an endowment or mutual benefit fund; to give aid and assistance to its members in times of sickness and distress; and for such other benevolent objects as may be necessary." On May 5, 1886, Levy Fountain No. 65, Washington, D. C., issued to Millie Cook a certificate or policy entitling her to membership in said Levy Fountain, "and of the mutual benefit degree of the Grand Fountain of the United Order of True Reformers, subject to the rules and regulations thereof, *which are contained in the constitution, the application and investigation blanks which are the basis of this contract* as if they were present in this certificate." In this certificate or policy the Grand Fountain promised "to pay to her heirs *or assigns,* or to any person or persons named in this certificate $125, at the time of death of the person above named in this certificate or policy; provided that the said person above named was a member in good standing at the time of death." The application upon which this certificate was issued does not appear in the record.

On June 5, 1897, a second certificate was issued to Millia Cook entitling her to membership in "the Class Department of the Mutual Benefit Degree of the Grand Fountain of the United Order of True Reformers," *"in consideration of the representations, warranties, and agreements made to it in the application, and the payment of an admission fee, and annual or quarterly dues, as designated in the application for this certificate as if herein set out at length."* This certificate promised "to pay to the heirs *or assigns* of the deceased member above named the

whole assessment of the benefited membership of Class E, not to exceed $500, which is the full face value of this certificate."

It was stipulated that the only provision in the application upon which this certificate was issued, in any way touching the person or persons to whom benefits should be paid, is as follows: "I, Millia Cook, agree to pay into the above Class Department on the date of this application the sum of $5.50 admission benefit fee to Class E, and an annual payment of $11.40, divided into four quarterly payments at $2.85 per quarter. I further agree that at my death my heirs *or assigns* shall receive fifty-five cents per member, the assessment of the benefited membership of Class E, not to exceed $500, which shall cause a forfeiture of this agreement and release the Class Department of the Grand Fountain of the United Order of True Reformers from further obligation."

On July 1, 1898, the act of March 3, 1898, of the legislature of Virginia, "to define and regulate fraternal beneficiary associations, orders, or societies," became effective.

Section 2 of the original charter of the Grand Fountain was amended August 8, 1898, to read as follows: "The said corporation shall issue certificates of membership to its members and shall pay death benefits to the heirs, assigns, personal, or legal representatives of the deceased members."

The charter of the Grand Fountain was again amended March 21, 1901, and, in this amended charter, benefits were restricted "to the family, heirs, blood relatives, affianced husband, affianced wife, or to a person dependent upon said member, as the member may direct." This amendment to the charter purports to have been made as the result of resolutions adopted at a "general meeting of the members (or stockholders, as they are sometimes designated) of the Grand Fountain of the United Order of True Reformers, held in the city of Richmond, Va., the first day of September, 1896, all of the said members being present in person or by proxy." It does not appear in the record that Milly Cook was either a stockholder or a member of the Grand Fountain, the certificate merely showing her to be a member of Levy Fountain, a subordinate fountain, located in Washington, D. C.

Slight changes were made in the constitution of the Grand Fountain prior to the above amendment in 1901, but it is unnecessary to notice these, as they in no way affected the original contract.

The two certificates were assigned by Milly Cook to the appellant as her executor on August 7, 1903.

It appears Milly Cook died October 4, 1904, leaving a will in which she appointed appellant as her executor.

On July 6, 1905, the Grand Fountain filed its bill of interpleader against appellant as said executor and as assignee of the two certificates, and against Sarah Edwards and Ellen Spencer, setting up the death of said Milly Cook and that appellant was her executor and also assignee of the two certificates, and that her heirs at law and next of kin were the said Sarah and Ellen, her sister and niece, respectively, and praying that these three parties might interplead together so that it might be determined to whom the said sum of $625 ought to be paid, and attached as exhibits to its bill copies of the pleadings in a suit at law brought by appellant against the Grand Fountain to recover said sum.

The answer of said defendants Sarah and Ellen prayed for payment of said sum to them, as also the answer of appellant prayed for payment to him. With his answer to the bill, appellant attached as exhibits copies of the two certificates for $500 and $125, and the two assignments of same reading, respectively, as follows:

I, Millia Cook, do hereby assign all my claim above mentioned in this certificate, at my death, to Dr. Robert W. Brown, my executor, of Washington, D. C.

Done at Washington, D. C., this seventh (7th) day of August, A. D., 1903.

                                              her
                                        Millia x Cook.
Witness:                                      mark
   James H. Winslow.
Witness:
   Charles H. Howard.

I, Millia Cook, do hereby decree and sign all my claim above mentioned in this certificate or policy, at my death, to Dr. Robert W. Brown, my executor.

Done at Washington, D. C., this seventh (7th) day of August, A. D., 1903.

her<br>
Millia x Cook.<br>
mark.

Witness:
   Charles H. Howard.
Witness:
   James H. Winslow.

The decree of the court below was that the said Sarah Edwards and Ellen Spencer, being the heirs at law and next of kin of the said deceased member, should be paid the death benefits, $625.

Appellant perfected and noted his appeal to this court.

*Mr. A. A. Birney* and *Mr. Joseph H. Stewart* for the appellant.

*Mr. Wilton J. Lambert* and *Mr. George H. White* for the appellees:

1. The fund in this cause is a beneficial fund, and in the case of *Leftwitch* v. *Wells,* 101 Va. 255, where the court had before it the charter, constitution, and by-laws of this identical association, and the matter involved was the construction of a similar certificate to the one presented in this cause, it was decided that the fund, even though created or secured, was a benefit fund, and that when the party had the power of designation or a change of beneficiaries under the terms of a certificate by an assignment, in a method provided by the by-laws of the society, such designation or change when made could not be considered an assignment, although so called, but would amount to a mere execution of a power of appointment, and that the holder of such an assignment would not be an as-

signee, but a mere appointee of its benefits, this conclusion being reached from the fact that the insured in this class of policies acquires no property right in the policies or fund of which the certificate is an evidence, but has only the right of appointing a beneficiary.   Wherefore it must necessarily follow that, if the insured has no property right in the policies or certificates, he could have nothing that would be susceptible of an assignment, and much less would he have the power to pass upon and dispose of the avails of such a certificate by will.

As a test of the correctness of such doctrine we have but to consider that one of the greatest objects of associations of this character is to place the avails of such policies beyond the reach of liability for debts that might exist against an estate, and were it to be assumed that the subject-matter of the certificate was proper to be disposed of by will, it would necessarily follow that before such disposition could be effected the creditor or creditors would be entitled to a participation in funds of this character for their claims, which is contrary to the enunciation of all authorities upon the question.   A strong case upon this subject, to the same effect as the one above referred to, is that of the *Maryland Mut. Ben. Soc.* v. *Cledenin,* 44 Md. 429, which doctrine is supported by *Millen* v. *Thompson,* 51 Tex. 7; *Walter* v. *Hinschel,* 42 Minn.; *Catholic Ben. Asso.* v. *Priest,* 46 Mich. 428; *Swift* v. *S. F. S.* and *E. B. S.,* 67 Cal. 574; *Ballou* v. *Giles,* 50 Wis. 614; *Brown* v. *Mutual Association,* 33 Hun, 266; *Masonic Aid Asso.* v. *Jones,* 154 F. P. A. 99.

2.  It is contended, however, by the executor and alleged assignee that the charter, constitution, and by-laws now in force, to wit, such as has been in force since 1901, cannot be held to control the fund in this case, inasmuch as Millia Cook became a member in 1897, and ought not to be bound, either herself or in relation to her policies, by any subsequent amendment, notwithstanding how properly they might have been adopted and acquiesced in.   This position, however, is clearly untenable when we take into consideration the fact that not only was Millia Cook bound by the action in adopting the amendment in which she acquiesced, but neither the alleged assignment nor the nomination of the executor or the execution of the will

took place until about three years after the amendment had be-
come controlling and had been in operation, and restricted and
controlled the disposition of the fund arising from the certifi-
cates. Bacon, Benefit Associations, sec. 244 (A), pp. 455–459.
*Whitehearst* v. *Whitehearst,* 83 Va. 155. It is not, therefore,
in the power of a society, or one of its members, or both, to en-
large or restrict classes properly designated, by amendment or
otherwise; and a society has no authority to create a fund for
a person who does not belong to one of such classes. It must
follow that a member has no power or right to designate a per-
son or group of persons as his beneficiary or beneficiaries at
variance with the provisions of the charter, and no act of a
member in attempting to make such appointment could deprive
the real beneficiary designated by law of his right to and inter-
est in a particular fund. The designation in such instance is
simply void. Niblack, Benefit Societies, secs. 158, 176, 230–
282. And, again, it is well settled that when the charter limits
the beneficiary to a certain class, a member has no right or
power to designate any not coming within said class. Joyce,
Insurance, secs. 729, p. 895; *Briton* v. *Supreme Council,* 19
Am. Rep. 376; Bacon, Benefit Associations, 168. Even the
insured and the insurer cannot undertake to stipulate in a cer-
tificate in any way that might affect the rights of those whom a
charter declares to be beneficiaries. Joyce, Insurance, secs. 742
and note; *American Legion of Honor* v. *Perry,* 140 Mass. 580.
If a statute has been amended after the issuance of a certificate,
any change which is made by such amendment as to the limita-
tions upon beneficiaries, must govern. 1 Bacon, Benefit Associa-
tions, 3d ed. sec. 311. *Grand Lodge, etc.,* v. *McKinstry,* 67 Mo.
App. 82; *Wist* v. *Grand Arch, A. O. U. W.* 33 Or. 271.

Mr. Justice Robb delivered the opinion of the Court:

As stated by counsel, the issue in this case is the narrow one,
whether or not the amendment of March 21, 1901, to the char-
ter, restricting the beneficiaries of policy holders to the family,
heirs, blood relatives, affianced husband or wife, or persons de-
pendent upon said policy holder, was binding upon Milly Cook

to the extent of modifying her contracts entered into prior to said amendment.

The original charter of the Grand Fountain, in force when each of these two certificates was issued, purports to be the charter of a joint-stock company. The first certificate or policy (as it is designated in the body thereof), dated May 5, 1886, certifies that the holder is "subject to the rules and regulations * * * *which are contained in the constitution, the application and investigation blanks, which are the basis of this contract as if they were present in this certificate.*" The Grand Fountain then promised to pay to her heirs,*or assigns* or person named in the certificate, $125, at the time of death of the certificate holder; provided, only, that the said certificate holder was a member in good standing at the time of death. This certificate contained no reservation of power to change or modify its provisions.

In the second certificate, issued June 5, 1897, it is stated "that the application signed by the applicant, and this certificate, taken together, shall constitute the contract between the member above named and the Grand Fountain." This contract was conditioned upon the payment by Millia Cook of annual or quarterly dues, in consideration of which the Grand Fountain promised to pay to her heirs, *or assigns,* the sum of $500. This certificate is also without any reservation of power to change or modify its provisions.

It is conceded that Milly Cook was a member in good standing at the time of her death.

Inasmuch as Milly Cook undoubtedly had the right at the time these certificates or policies were issued to her, and down to the time of the above amendment to the charter of the Grand Fountain, in 1901, to name anyone she chose as a beneficiary under such certificates or policies, it becomes necessary to carefully examine this amended charter to see whether it was intended to have a retrospective effect. Statutes will be given a prospective operation only, unless the language used clearly indicates that they were intended to be retrospective in their operation,—especially in a case where to give them a retrospective effect would be to impair the obligation of a contract.

Prior to the enactment of the above act of March 3, 1898, there was no law in Virginia specifically authorizing beneficial associations, and it was probably for this reason that the Grand Fountain was incorporated as a joint-stock company. This act contains no language indicating that it was intended to be retrospective in its operation, and the reorganization of the Grand Fountain was effected, as set forth in its amended charter, "under the provision of the general laws of the land, being specially authorized and provided for in the acts of the regular session of 1897–98, of the general assembly of the State of Virginia," which was the above act. There was a decided departure in the new charter from the scope and purpose of the old, both as regards the objects of the Grand Fountain and the government and control thereof. In the new charter there was a specific reservation of power "to make its own constitution, by-laws, rules, and regulations, *as well as the general laws for the government of all its branches, and to alter and amend the same.*" In this amended charter the right is specifically reserved *"to alter and amend"* the constitution and by-laws of the Grand Fountain. The fact that the original charter contained no such reservation, and that neither of the certificates or policies issued to Milly Cook contained such a reservation, that there was such a departure from the original scope and purpose of the Grand Fountain, and that no effort was made to take up outstanding certificates and issue new ones in their stead,—all indicate that it was not the intention, when this reorganization was made, that it would be retrospective in its effect, but that it was intended that the new Grand Fountain would take over the business of the old under the terms and conditions named in the contracts made by the old company.

The case of *Voigt* v. *Kersten,* 164 Ill. 314, 45 N. E. 543, is almost precisely like the instant case. That was a bill of interpleader filed by the High Court of the Independent Order of Foresters of the State of Illinois to determine who was entitled to the fund due on a certificate issued by the Order to one Fisher. This certificate was dated January 14, 1893, and in it the Order promised to pay Voight $1,000 on the death of Fisher. Fisher died on October 30, 1894, in good standing.

The Order was organized under the statute in force July 1, 1887, which provided "that corporations, associations, or societies for the purpose of furnishing life indemnity or pecuniary benefits upon the death of a member, to the widows, heirs, relatives, legal representatives, or the designated beneficiaries of such deceased member" [3 Starr & C. Anno. Stat. (Ill.) chap. 73, § 122], might be organized. At the time the certificate was issued one of the by-laws of the Order provided that "on the death of a member of this Order in good standing the endowment shall be paid, first, to such person or persons *as he may designate in his last will and testament* or endowment certificate; second, to his widow; third, to his orphans; fourth, to his heirs." On June 22, 1893, another statute applicable to such orders went into effect, whereby "payment of death benefits shall only be made to the families, heirs, blood relatives, affianced husband, or affianced wife of or to persons dependent upon the member, and such benefits *shall not be willed* or assigned or otherwise transferred to any other person." In 1894, in accordance with the provisions of this later statute, the Order amended its by-laws, and adopted the words of the statute, omitting only the words "affianced husband." On October 19, 1894, Fisher requested the Order to change the beneficiary from Voight to Mrs. Kersten, who was not a member of Fisher's family, blood relative, affianced wife, or dependent upon said Fisher during his lifetime, as provided in the amended statute and by-laws, which change the Order refused to make. Fisher died on the 30th of October, leaving a will in which he designated Mrs. Kersten as the beneficiary of his certificate. The superior court awarded the fund to Voight, and on appeal to the appellate court the decree was reversed. The supreme court, in sustaining the decision of the appellate court, quoted its opinion from which we take the following: "At the time the contract was made between the deceased and the complainant order, the right to appoint the beneficiary or change the name existed, and, we think, was an important part of the contract entered into. It would seem that the construction of the act passed in June, 1893, giving it the effect to destroy that right of appointing a beneficiary or naming another beneficiary, which existed in

favor of the deceased under his contract prior to the passage of the act, *would be to give the act a retrospective effect and destroy the obligation of the contract entered into between the deceased and the complainant. It is a recognized rule in the construction of statutes that they should be so construed as to give them a prospective operation only,* and they should be allowed to operate retrospectively only where the legislative intention to give them such operation is clear and undoubted. * * * We think that the right to make this change was one of the considerations entering into the contract at the time the deceased obtained his certificate from the complainant, and that it was a material right, and one that could not be taken away by the legislature, and we do not think that the legislature intended, by the act of June, 1893, to affect certificates of insurance issued prior thereto." After quoting the opinion of the appellate court, the supreme court said: "We fully concur with the reasoning and conclusion of the appellate court in this case, and the judgment of the appellate court is affirmed."

We are in accord with the ruling in this case, and think the right of Milly Cook to name without limitation the person or persons who should be benefited under her contracts with the Grand Fountain was a material right; possibly, the very consideration that moved her to enter into these contracts; and a right which without her consent could not be taken away. In the case of *Morton* v. *Supreme Council, R. L.* 100 Mo. App. 76, 73 S. W. 259, the certificate bound the member insured to comply with all laws and usages of the council then in force *or which might thereafter be adopted.* At the time the certificate was issued one of the by-laws provided that, if a member committed suicide within two years after the policy was issued to him, the council would be liable for one half of the policy. Subsequently this by-law was amended so as to provide that, if any member committed suicide, his beneficiaries would receive only one half of the face value of the policy. The member committed suicide more than two years after the policy was issued to him, and it was held that the council was liable for the full amount of the policy. In its opinion, the court said: "Certificates in fraternal associations for indemnity in the event of

death are contracts for insurance, subject to all the rules of law which control the interpretation of contracts generally, create and enforce their obligations, and prohibit their impairment or subsequent alteration without the consent of both the contracting parties."

The case of *Knights Templars' & M. Life Indemnity Co.* v. *Jarman,* 44 C. C. A. 93, 104 Fed. 638, is in line with the above State decisions.  One of the questions in that case was whether the amendments to the constitution of the company, adopted after the policy was issued, and which limited to some extent the liability of the company, were binding upon the policy holder.  The circuit court of appeals for the eighth circuit, through Thayer, Circuit Judge, said: "We have next to determine whether the amendments to the defendant's constitution of date January 8, 1889, February 20, 1894, and January 14, 1896, whereby it expunged those provisions of its constitution which obligated it, on the death of a member, to refund 'all money paid on the policy in assessments,' have the effect of depriving the plaintiff of the right to recover the assessments paid on the policy in controversy, and of limiting her right of recovery to the principal sum therein mentioned.  The argument in favor of giving the amendments such effect as is last described is based wholly on the concluding paragraph of Jarman's application for the policy, which is as follows: 'I further agree, if accepted, to abide by the constitution, rules, and regulations of the company as they now are, or may be constitutionally changed hereafter.'  Conceding, in accordance with the stipulation of the parties, that the amendments in question were adopted legally in the manner prescribed by the defendant's constitution and by-laws, we observe in the first instance that there is nothing to indicate that the amendments were intended to have a retrospective operation, and reduce the amount payable on certificates or policies like the one at bar, which was then outstanding, and, in plain language, obligated the company to refund all assessments that might be paid thereon.  The present record contains no evidence which shows affirmatively that the amendments were intended to operate retrospectively and extinguish the obligation to refund assessments that had

been expressly assumed, while the fact that outstanding policies were not recalled, and the promise to refund assessments expunged or erased from the face of such policies, fairly indicates, we think, that the amendments were designed to operate prospectively on policies thereafter executed.  *  *  *  He [the policy holder] was to occupy a dual relation to the company: First, as one of its members; and, second, as any other individual having a contract with it.  In the former relation he was willing to be bound by any lawful amendment to the company's constitution and by-laws that the members collectively saw fit to adopt, which concerned the government of the corporation or the mode of transacting its business, and did not impair any of the essential provisions of his contract.  He probably foresaw that in the course of time the company might find it expedient to make some changes in its method of corporate government, or in the mode of transacting its business, or in its rules of discipline; and he doubtless intended to assent to all amendments of the constitution and by-laws which were framed for that purpose, and would not deprive him of any substantial right or benefit secured by his policy.  *  *  *  And, even if it did appear that he voted for the amendments and was aware of their adoption, the presumption would be that he did so in the belief that the amendments operated prospectively, and not retrospectively upon antecedent contracts." See also *Smith* v. *Pinch,* 80 Mich. 332, 45 N. W. 183; *Bragaw* v. *Supreme Lodge, K. L. of H.* 128 N. C. 354. 54 L. R. A. 602, 38 S. E. 905. "Claims for money due by virtue of an agreement are unlike mere matters of discipline, questions of doctrine, or of policy, and are not governed by the same rules.  *  *  *  One who asserts a claim to money due upon a contract occupies an essentially different position from one who presents a question of discipline, of policy, or of doctrine of the order or fraternity to which he belongs." *Bauer* v. *Samson Lodge, K. of P.* 102 Ind. 262, 1 N. E. 571.  In the cases relied on by appellee, either express authority was reserved to change the constitution and by-laws existing when the certificates were issued, or the member subsequently performed some act clearly indicating his acquiescence in the amendments.  The case of *Grand Lodge, A.*

*O. U. W.* v. *McKinstry,* 67 Mo. App. 82, illustrates this point. After the certificate was issued in that case, the constitution of the lodge was amended to conform to a statute subsequently enacted, which restricted the power of designation to classes of persons other than those mentioned in the certificate. The policy holder, however, "surrendered his old certificate and received a new one," clearly indicating a waiver on his part of any rights he might have had under the original certificate.

But it is said that Milly Cook assented to and acquiesced in the amendment to the charter of the Grand Fountain restricting her right to appoint beneficiaries under her contracts. We do not think she did. The only allusion in the record upon which such a claim can be founded is the preamble to the resolutions authorizing the "Grand Worthy Master" and the "Grand Worthy Secretary" of the Grand Fountain to make application to the circuit court of the city of Richmond to have its charter altered and amended. That preamble, as above stated, says: "The members (or stockholders)" of the Grand Fountain were all present in person or by proxy. There is nothing in the record to indicate that Milly Cook was either a stockholder or a member of the Grand Fountain. Assuming that Levy Fountain, a subordinate fountain, was entitled to a delegate and was. so represented when these resolutions were adopted, we cannot assume, in the absence of direct proof, that the delegate was authorized to consent to the impairment of the contracts of the old fountain. Inasmuch as there was no reservation of power to modify or change these contracts, either in the original charter or in the contracts themselves, and inasmuch as the Grand Fountain after its charter was amended appears to have made no attempt to take up these certificates or contracts and issue new ones in conformity with the amended charter, we cannot assume that because the policy holder continued payments under such contracts she thereby intended to assent to a material modification thereof. On the contrary, the natural inference to be adduced from the facts is that she expected to be bound by the new constitution as far as it provided for the government and discipline of the Grand Fountain and the subordinate

fountain to which she belonged, but that her contract rights would be preserved and protected.

The decree is reversed, with costs, and the cause remanded for a decree in conformity with this opinion.            *Reversed.*